**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL–CIO, Petitioner,**

v.

**FEDERAL LABOR RELATIONS AUTHORITY, Respondent.**

**National Treasury Employees Union, Intervenor.**

**No. 87–1083.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 17, 1987.

Decided March 4, 1988.

---

948

Martin R. Cohen, with whom Mark D. Roth was on the brief for petitioner. Joe Goldberg and Charles A. Hobbie, Washington, D.C., also entered appearances for petitioner.

Arthur A. Horowitz, Associate Sol., Federal Labor Relations Authority, with whom Ruth E. Peters, Sol., and William E. Persina, Deputy Sol., Federal Labor Relations Authority were on the brief for respondent. Robert J. Englehart, Washington, D.C., Attorney, Federal Labor Relations Authority also entered an appearance for respondent.

Elaine D. Kaplan, with whom Lois G. Williams, Washington, D.C., was on the brief for intervenor, Nat. Treasury Employees Union.

Before ROBINSON and WILLIAMS, Circuit Judges, and GORDON *, Senior District Judge.

Opinion for the Court filed by Circuit Judge WILLIAMS.

Dissenting opinion filed by Senior District Judge GORDON.

WILLIAMS, Circuit Judge:

A provision of the Federal Sector Labor–Management Relations Statute ("FSLMRS" or the "Statute"), 5 U.S.C. §§ 7101–7135 (1982), provides that a government agency commits an unfair labor practice if it "sponsor[s], control[s], or otherwise assist[s] any labor organization," unless the assistance is "customary and routine" and also furnished to "other labor organizations having equivalent status." 5 U.S.C. § 7116(a)(3).[1] All agree that this provision has essentially the meaning of its predecessor (§ 19(a)(3) of Executive Order No. 11,491),[2] and that an agency commits an unfair labor practice if it provides access to or use of its facilities to a union lacking status "equivalent" to that of an incumbent union. Here we deal with an agency's obligations in public areas adjacent to its workplace. The American Federation of Government Employees ("AFGE") contends that the Health Care Financing Administration ("HCFA") should have excluded representatives of a rival union from such areas and that its failure to do so was an unfair labor practice. The Federal Labor Relations Authority

---

* Of the United States District Court for the Eastern District of Wisconsin, sitting by designation pursuant to 28 U.S.C. § 294(d).

1. A union is considered to have attained "equivalent status" under § 7116(a)(3) if it has filed a petition raising a "question concerning representation" or if it has intervened in proceedings related to such a petition. *See United States Department of the Interior, Pacific Coast Region, Geological Survey Center, Menlo Park, California,* 2 A/SLMR 160 (1972).

2. 3 C.F.R. § 861 (1966–70 Comp.), *reprinted in* 5 U.S.C.A. § 7101 note (1980). Although Executive Order No. 11,491 is no longer in force, decisions of the Assistant Secretary for Labor–Management Relations ("A/SLMR") and the Federal Labor Relations Council concerning § 19(a)(3) are generally considered to be authority for the interpretation of § 7116(a)(3) as the two provisions do not differ in any material respect. *See AFGE v. FLRA,* 793 F.2d 333, 337 n. 9 (D.C.Cir.1986) ("*AFGE I*"): *NTEU v. FLRA,* 774 F.2d 1181, 1192 (D.C.Cir.1985).

("FLRA" or "Authority") concluded otherwise.

■ We find the FLRA's position correct. The relevant General Services Administration ("GSA") regulations did not give HCFA authority to exclude the rival union's representatives from the adjacent public areas in the building; the Authority's finding that HCFA did not in fact exercise control over the areas was supported by substantial evidence. We further agree with the Authority that § 7116(a)(3) does not impose an affirmative duty on an agency to attempt to persuade its government landlord, the GSA, to exclude a rival union from public areas of the building.

## I. BACKGROUND

This case arose out of the efforts of the National Treasury Employees Union ("NTEU") to obtain signatures on a petition calling for a representation election among HCFA employees at government office buildings in Baltimore. HCFA's offices there are located in a complex that includes two connected buildings called the East High Rise and East Low Rise. Although the agency occupies the majority of the space in the two buildings, the Social Security Administration also leases office space on two floors of the East Low Rise. Both buildings are owned and operated by the GSA. HCFA leases its space from GSA and pays a Standard Level Users Charge (known by the unappealing acronym "SLUC"). The agency pays no SLUC for the buildings' common or public areas—their lobbies and hallways and the cafeteria located in the East Low Rise. In these areas the public is granted unrestricted ingress and egress. An occupant agency may also use these areas for certain limited purposes with GSA permission.

AFGE has been the exclusive representative of certain classes of HCFA employees in Baltimore and Washington since 1980. In November 1981, however, NTEU representatives informed William Holman, HCFA's Director of Labor Relations, that NTEU intended to solicit signatures from HCFA employees at the Baltimore complex with the goal of forcing a representation election between AFGE and NTEU. Holman told the NTEU representatives that HCFA could not allow NTEU access to HCFA-leased space, but indicated (in response to NTEU's inquiry) that certain other areas in the building were considered public areas. NTEU did not request, and Holman did not grant, HCFA's permission to solicit signatures in the public areas.

NTEU began its efforts at the complex in late November 1981 outside the entrances of the buildings occupied by HCFA. Soon representatives of NTEU took their mission indoors, distributing literature and soliciting signatures in the first floor lobby and the ground floor hallways of the East Low Rise. Sometime during December, Holman accosted an NTEU representative in a public area of the building and asked whether GSA had granted the union permission to solicit there. The representative responded that permission had been granted; testimony in the record indicates that GSA indeed gave permission, though not (so far as appears) in the form of a written permit. NTEU's campaign in the public areas continued until the Christmas holiday.

Not surprisingly, the AFGE local resisted. Throughout December its representatives asked Holman to deny NTEU access to the premises. But Holman replied that he could do nothing; he had been told by Richard Rohde, HCFA's liaison with GSA, that HCFA had no control over the public areas. Although the GSA employee in charge of the East Low Rise and East High Rise buildings "waivered [sic] a little bit" as to HCFA's power to bar NTEU representatives, his superior, the GSA area manager, backed Rohde's statement.

In early January 1982 NTEU indicated that it intended to renew its efforts at the complex. Holman requested a two-week moratorium on solicitation in order to determine once and for all whether HCFA had authority to keep NTEU out of the public areas of the buildings. NTEU held off for a time, but then again told Holman that it intended to resume its activities in the East High Rise and East Low Rise;

Holman replied that his investigation had revealed that HCFA had no authority to exclude NTEU. On four separate occasions in late January and February 1982, NTEU representatives solicited employee signatures.

On February 4, 1982 AFGE filed unfair labor practice charges with the Authority, alleging that the HCFA had committed an unfair labor practice under 5 U.S.C. § 7116(a)(3) by permitting or failing to prevent these solicitations. The Authority's General Counsel issued a complaint against the HCFA. Following a hearing, the Administrative Law Judge concluded that HCFA had no control over the public areas and recommended that the Authority dismiss the charges against the agency. *Department of Health and Human Services, Health Care Financing Administration*, 18 FLRA 429, 436 (1983). The Authority adopted the ALJ's findings of fact and conclusions and dismissed the complaint. *Department of Health and Human Services, Health Care Financing Administration*, 18 FLRA 427 (1983).

AFGE appealed the Authority's decision to this court. We remanded to the Authority, holding that the FLRA needed to consider whether the GSA's Federal Property Management Regulations ("FPMRs"), 41 C.F.R. § 101–1.00 *et seq.* (1986),[3] conferred authority on HCFA to forbid NTEU's solicitation, and to determine "the extent to which, under past practice, the occupant agency has actively participated in decisions pertaining to use of the so-called public areas." *AFGE v. FLRA*, 793 F.2d 333, 336 (D.C.Cir.1986) ("*AFGE I*").

On remand, the FLRA reaffirmed its earlier decision. *Department of Health and Human Services, Health Care Financing Administration*, 24 FLRA 672 (1986) ("*Decision on Remand*"). Relying on an *amicus* brief filed by the GSA, the Authority determined that the applicable GSA regulations did not give any authority to HCFA to allow or forbid NTEU access to the public areas. *Id.* at 675. It found that

NTEU's permission to solicit signatures in the public areas came from GSA. *Id.* at 676. Second, the FLRA found nothing in the record to indicate that HCFA had ever exercised *de facto* control over the lobbies, hallways, or cafeteria in the past. *Id.* Finally, the Authority concluded that § 7116(a)(3) did not impose an affirmative duty on the HCFA to attempt to persuade the GSA to prevent the solicitations by NTEU. *Id.* AFGE appeals again.

An extended line of precedents under § 7116(a)(3) and its predecessor establish that an agency commits an unfair labor practice if it provides access to or use of its facilities to a union without "equivalent status." The Authority, or its predecessor, the Assistant Secretary for Labor–Management Relations ("A/SLMR"), has found an unfair labor practice when an agency provides space on its premises for a union without exclusive status to conduct an organizational campaign, *Department of the Army, U.S. Army Natick Laboratories, Natick, Massachusetts*, 2 A/SLMR 193 (1973), when it allows a union to solicit membership during duty hours in a unit exclusively represented by another union, *Commissary, Fort Meade, Department of the Army*, 7 A/SLMR 130 (1977), when it permits a rival union to use management's half of a locked bulletin board, *United States Department of Justice, United States Immigration and Naturalization Service*, 9 FLRA 253 (1982), *rev'd on other grounds, United States Department of Justice v. FLRA*, 727 F.2d 481 (5th Cir. 1984), when it provides display tables for a union to solicit membership, *Defense Supply Agency, Defense Contract Administration Services Region, SF, Burlingame, California*, 2 A/SLMR 106 (1973); or when it allows a rival union to distribute materials through the agency's internal mail system, *U.S. Department of the Interior, Pacific Coast Region, Geological Survey Center, Menlo Park, California*, 2 A/SLMR 160 (1972). There being no contention that NTEU has attained equivalent status, the HCFA would clearly be in viola-

---

**3.** All citations to the Federal Property Management Regulations are to those in effect during the period in which NTEU solicited at the Balti-

more complex. Amended regulations took effect in April 1987. *See* 52 Fed.Reg. 11,263 (1987).

tion of the Statute if it had allowed NTEU to solicit signatures on its *own* leased premises. *See AFGE I,* 793 F.2d at 337.

Here we consider the extent to which the established doctrine reaches the activities of a rival union in the public areas of buildings containing an agency's offices. As we recognized in our first look at this case, the crucial questions are, first, "whether and to what extent HCFA controls access to the public areas," *AFGE I,* 793 F.2d at 337, and second, "the extent of HCFA's responsibility" under § 7116(a)(3) in light of whatever degree of control the agency may have, *id.* at 338.

## II. THE AGENCY'S CONTROL OVER THE PUBLIC AREAS

On remand from this court, the Authority determined that relevant GSA regulations did not give HCFA power to allow or deny the solicitations at issue, *Decision on Remand,* 24 FLRA at 675, and that the record was barren of evidence that HCFA had exercised *de facto* control over the public areas in the buildings, *id.* at 676. Thus, the Authority concluded that "GSA alone had control over the public spaces in question, and that HCFA did not have any control over these spaces." *Id.* We cannot disagree with these conclusions.

### A. *The GSA Regulations*

The primary task of the Authority on remand was to decide whether the FPMRs promulgated by the GSA conferred on HCFA the authority to control the public spaces of the Baltimore complex. § 101–20.308 of the FPMRs broadly pro-

4. The regulation provides in relevant part:

Soliciting alms, commercial or political soliciting, and vending of all kinds, displaying or distributing commercial advertising, or collecting private debts on GSA-controlled property is prohibited. This rule does not apply to (a) national or local drives for funds for welfare, health or other purposes ... and sponsored or approved by the occupant agencies; (b) concessions or personal notices posted by employees on authorized bulletin boards; (c) solicitation of labor organization membership or dues authorized by occupant agencies ... and (d) lessee, or its agents and employees, with respect to space leased for commercial, cultural, educational, or recreational use....

scribes "soliciting alms, [and] commercial or political soliciting," but provides an exception for "solicitation of labor organization membership or dues *authorized by occupant agencies,*" 41 C.F.R. § 101–20.308(c) (emphasis added) (referred to for simplicity as "§ 308(c)").[4] The crux of the petitioner's argument is that HCFA's power under the exception gave it enough control over the buildings' public space to trigger its § 7116(a)(3) duties. The Authority, however, relying on the GSA's *amicus* brief interpreting the regulations, determined on remand that the activities of NTEU "were not of the type that could have been allowed or denied by HCFA." *Decision on Remand,* 24 FLRA at 675. We agree.

The only portion of the regulations potentially affording HCFA any authority over the areas in question is § 308(c)'s exception for "solicitation of labor organization membership or dues authorized by occupant agencies." The activity covered by the exception would be conducted only by a labor organization with status as an exclusive bargaining agent; it is quite distinct from the solicitation of *signatures* on a petition by a rival union aimed at bringing about a new representation election. This distinction is borne out by the record in this case. Scott Schaefer, the NTEU organizer at the Baltimore complex, testified that his union's activity at the East High Rise and East Low Rise in November 1981–February 1982 was directed solely at forcing a representation election, not at directly signing up HCFA employees as NTEU members:

41 C.F.R. 101–20.308.

The GSA itself exercises exclusive authority to enforce these regulations with respect to "public areas," *see* § 101–20.309, and defines a "public area" as "any area of a public building or its grounds ordinarily open to members of the public, such as lobbies, courtyards, auditoriums, meeting rooms, and any other area not specifically leased by any lessee of the public building." 41 C.F.R. § 101–20.701(b). It is clear that the areas in which NTEU solicited signatures—lobbies, hallways, and the cafeteria—fall within that definition.

Q: During the period of December 15, 1981, and February 16, 1982, when you personally went to HCFA to solicit signatures, what is it you would say to employees as they approached you?

A. The first thing, you know, "Hello, my name is Scott Schaefer, and I'm with the National Treasury Employees Union. We are circulating a petition among Health Care Financing Administration employees to have the Federal Labor Relations Authority to [sic] conduct a secret ballot election. We would like you to sign that petition to support our effort to do that." ... In that, "sign the petition" only means that they request an election to be held, that NTEU be on that ballot when an election is held. It does not mean that they support NTEU or they support any union or that they don't support the current union, or that they want to join NTEU or anything of that nature, just that they're requesting that an election be held, and that NTEU be on the ballot when the election is held.

Q. When you make these pitches ... to people, do you at any time suggest that they become members of NTEU or do you solicit their membership in NTEU in any way?

A. Absolutely not.

J.A. at 125–27. Schaefer went on to explain that an employee could not become an NTEU member until the union was the exclusive representative of the bargaining unit. NTEU therefore begins the solicitation of employee *membership* only after it wins a representation election. *Id.* at 127.

To be sure, an employee's signature on such a petition could lead eventually to the employee's membership in the soliciting union in the future. If NTEU (1) gathers a sufficient number of employee signatures on its petition calling for an election, (2) wins the election, and (3) is then certified by the FLRA as the exclusive bargaining representative for the unit containing HCFA employees, NTEU could then begin asking the unit's employees to become union members. We think, however, that the NTEU's activities in this case are far too remote from the future solicitation of members to fit within the plain language of the § 308(c) exception.

GSA—or at least a GSA lawyer—reads its rule as we do. Its brief before the FLRA asserts that the exception is intended "to permit labor organizations which are the exclusive representatives of employees in a Federal agency to conduct membership drives to solicit union membership" to the extent that such solicitation will involve solicitation of monetary funds prohibited by § 101–20.308. GSA *Amicus Curiae* Brief at 15 n. 10.

An official GSA position on its rule would, if reasonable, control unless "plainly inconsistent with the wording of the regulation[ ]." *United States v. Larionoff,* 431 U.S. 864, 872–73, 97 S.Ct. 2150, 2155–56, 53 L.Ed.2d 48 (1977); *see also Lyng v. Payne,* 476 U.S. 926, 106 S.Ct. 2333, 2341–42, 90 L.Ed.2d 921 (1986); *National Trust for Historic Preservation v. Dole,* 828 F.2d 776, 782 (D.C.Cir.1987); *San Luis Obispo Mothers for Peace v. NRC,* 789 F.2d 26, 30 (D.C.Cir.1986) (en banc). The GSA brief is not such an official position; it was signed by an attorney in the Office of General Counsel and issued in the course of the remand proceedings. As the GSA has nothing at stake in this proceeding, there is no special reason to think that the briefwriter would have been motivated by any desire to protect the agency from the consequences of a casually adopted position; thus it is not subject to the usual vulnerability of "*post hoc* rationalizations." *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 419, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971); *cf. United States v. Paddack,* 825 F.2d 504, 513 (D.C.Cir.1987). On the other hand, it plainly lacks the credentials of a position that agency heads have staked out after adjudicative or rulemaking procedures allowing a full vetting of alternatives. In any event, we will not try to articulate a precise standard of the deference due. Although we believe the GSA legal opinion certainly entitled to a modicum of respect, the exact degree is no matter as we believe its construction to be

decidedly the better view.[5]

Accordingly, we hold that the Authority correctly concluded that the § 308(c) exception did not confer upon HCFA the power to forbid NTEU's solicitation of support for a representation election in the public areas of the complex.[6]

The Authority, relying on the GSA *amicus* brief, also argued that § 101–20.308's proscription of "soliciting alms, commercial or political soliciting" did not encompass the NTEU's activities in the instant case. FLRA Brief at 33; GSA *Amicus Curiae* Brief at 15. NTEU made the same argument as an intervenor. NTEU Brief at 26. While likely correct, we do not think this determination is necessary to the outcome. In the public areas GSA possesses sole authority to grant or deny permits. *See* 41 C.F.R. §§ 101–20.701(c), 101–20.702(a). Only the § 308(c) exception gives HCFA a voice in the exercise of that authority. Thus, as it is inapplicable, any failure by GSA to enforce its regulations could be charged to HCFA only on a broad theory that § 7116(a)(3) imposes on federal agencies an affirmative duty to engage in an advocacy program with other agencies to keep rival unions at bay. For the reasons given below, we affirm FLRA's finding that no such duty exists.

### B. *FLRA's Finding on Actual Control by HCFA*

Petitioner suggests in the alternative that the HCFA may have exercised *de facto* control over the public areas in the Baltimore complex, and argues that this control should have been used to exclude NTEU from the premises. Accordingly, in *AFGE I*, we asked the Authority on remand to determine the extent to which the HCFA had in the past actually exercised control in the public spaces of the complex. *AFGE I*, 793 F.2d at 338. The Authority examined the record and discovered no evidence of such control. *Decision on Remand*, 24 FLRA at 676. We find the conclusion supported by substantial evidence. *See* 5 U.S. C. § 7123(c) (1982).

At the ALJ's hearing, HCFA called two witnesses familiar with the relationship between HCFA and the GSA at the Baltimore government office complex. Both witnesses made it clear that it was HCFA's longstanding understanding that the agency had no control over the public areas of the complex. Richard Rohde, the Director of the HCFA's Division of General Services and the agency's liaison with the GSA, testified that

> GSA has made it clear to us over the years that the public areas, the lobby, cafeteria, et cetera, is public access space

**5.** Our finding that the GSA brief's reading of the regulation is the better of the two offered here leaves open the question whether a different interpretation by the GSA itself might prove not "plainly erroneous or inconsistent with the regulation," *Larionoff*, 431 U.S. at 872, 97 S.Ct. at 2155 (quotations omitted), and therefore entitled to deference. Plainly the scope of judicial deference to an agency's interpretation of its own regulation cannot turn upon the accident of whether a court's first confrontation with the issue precedes or follows the agency's.

**6.** In its reply brief, the petitioner argues for the first time that several other sections of the FPMRs providing for "communication and cooperation" between occupant agencies and the GSA gave HCFA a role in running the public areas of the complex. The petitioner suggests that these instances of cooperation prove that HCFA had effective control over the public areas. *See, e.g.,* 41 C.F.R. § 101–5.106 (cooperation in use of "centralized facilities"); 41 C.F.R. § 101–5.300 *et seq.* (cooperation in provision of health services); 41 C.F.R. § 101–17.002 *et seq.* (assignment of space by GSA with occupant agency input); 41 C.F.R. § 101–20.002–1(a)–(k) (alterations, repairs, improvements, and maintenance of assigned space); 41 C.F.R. § 101–20.101(c) (modifications of assigned space by occupant agencies); 41 C.F.R. § 101–20.103.1 *et seq.* (cooperation in provision of security for building); 41 C.F.R. § 101–20.104–1 (communication regarding allocation of parking space); 41 C.F.R. § 101–20.105–1 *et seq.* (cooperation regarding safety programs). This argument is utterly without merit. Although these sections do provide for some degree of cooperation between the occupant agency and GSA regarding the use of leased and public space, they do not by any stretch of the imagination establish that HCFA had any power to exclude a rival union from public areas of the premises. Indeed, we think the cited regulations bolster our conclusion that GSA controlled the public areas: to the extent they do confer on HCFA some control over public areas, they are exceptions that prove the rule of general GSA control.

and not our space. And any dealings in this space, GSA would control these dealings, not us.

J.A. at 103. Rohde also testified that the agency could not eject members of the public or union members from that space, *id.*, "unilaterally mak[e] and/or enforc[e] decisions on this GSA space," *id.* at 99, designate a part or all of the building as open to the public, *id.* at 98, or "do anything with [the public space]" without requesting GSA's permission by phone or memorandum, *id.* at 99. Indeed, Rohde stated that if HCFA were dissatisfied with the offerings of the cafeteria's food service concessionaires, it would direct its beef to the GSA. *Id.* at 102. The testimony of William Holman, HCFA's Director of Labor Relations, supported these conclusions. Holman testified that when he asked the area manager for GSA, one Roth, whether HCFA could exclude NTEU from the premises, Roth replied that GSA would not bar NTEU from the public spaces. *Id.* at 89.

In contrast, AFGE was unable to offer any convincing evidence that HCFA had the power to exclude NTEU representatives from the public areas. The best it had to offer was the testimony of the vice-president of Local 1923 that a Mr. Glover, apparently the manager of the East High Rise and East Low Rise, had told him at one point that "Holman controlled the area, or the agency did since they were the occupants." J.A. at 47. Glover's perception, however, was later contradicted by his superior, Roth, who stated to Holman, "I don't care what they do, I'm the damn boss, and I'm telling you that if NTEU wants to come on this property, I'm not stopping them." J.A. at 89. The Authority was entitled to credit Roth's understanding over that of his lieutenant.

The only other indications that HCFA had any role in the public areas were a reception desk staffed by an HCFA employee in the lobby of the East High Rise, *id.* at 49, and signs on entryway doors directing HCFA visitors to the receptionist, *id.* at 52. At most, however, the desk and signs establish that GSA *permitted* the agency to use a small parcel of the public areas, not that HCFA controlled the space. The record thus amply supports the Au-

thority's finding that the agency did not exercise actual control.

The Authority was, moreover, well within its discretion in refusing to remand the case to the ALJ for a new hearing on HCFA's past control. The decision to reopen proceedings for additional evidence is one generally committed to the Authority's discretion. *See New York Council, Association of Civilian Technicians v. FLRA*, 757 F.2d 502, 511 (2d Cir.), *cert. denied*, 474 U.S. 846, 106 S.Ct. 137, 88 L.Ed.2d 113 (1985). In this case, AFGE and the General Counsel were both aware at the initial hearing before the ALJ that HCFA's control over the public areas was a—perhaps *the*—crucial issue, and thus had ample opportunity to present evidence to prove their allegations. Moreover, in its request for a hearing on remand the petitioner made no specific allegations on the subject. In these circumstances, it was proper for the FLRA to rely upon evidence already in the record and deny the requested hearing.

Petitioner's suggestion that our decision in *AFGE I* mandated a hearing is also without merit. The primary purposes of the remand was to allow the FLRA to consider the meaning of the § 308(c) exception. *AFGE I*, 793 F.2d at 337–38. While we noted that the record did not reveal "the extent to which ... the occupant agency has actively participated in decisions pertaining to use of the so-called public areas," *id.* at 338, we asked merely for "a consideration of these matters," *id.*, not further hearings. Our opinion cannot be read to have stripped the FLRA of its discretion to decide whether a hearing was necessary. In the absence of specific claims of HCFA exercises of control, its decision not to embark on a new hearing was well within that discretion. *See Veg-Mix, Inc. v. United States Department of Agriculture*, 832 F.2d 601, 607–08 (D.C.Cir. 1987); *Citizens for Allegan County, Inc. v. Federal Power Commission*, 414 F.2d 1125, 1128 (D.C.Cir.1969).

III. THE CLAIM THAT § 7116(a)(3) REQUIRES AN AGENCY TO EXHORT GSA ON AFGE'S BEHALF

AFGE argues that, even if HCFA had no legal or actual control over the public areas

in the complex, the agency committed an unfair labor practice under § 7116(a)(3) because it was obliged—but failed—"to undertake actions to the extent of its authority." Petitioner's Brief at 23. In practice this obligation would evidently entail "convey[ing] to GSA its opposition" to NTEU's activities. *Id.* The Authority rejected this argument. *Decision on Remand,* 24 FLRA at 676. We review the decision with "considerable deference" in light of the Authority's mandate to give content to the Statute. *See Bureau of Alcohol, Tobacco & Firearms v. FLRA,* 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983).

The language of § 7116(a)(3) plainly does not require the Authority to impose any such duty on an agency. The provision merely declares it an unfair labor practice to "sponsor, control, or otherwise assist" a rival union. 5 U.S.C. § 7116(a)(3). We have discovered no case from the courts, the Authority, or the A/SLMR even suggesting any agency duty to plead the incumbent union's cause as to the use of property outside the workplace and beyond the agency's direct control.

Indeed, the case closest to the instant one strongly supports the FLRA's decision. In *Department of the Air Force, Grissom Air Force Base, Peru, Indiana,* 6 FLRC 406 (1978), the Federal Labor Relations Council ("FLRC") (the body charged with reviewing decisions of the A/SLMR under Executive Order 11,491) held that the Air Force did not violate the predecessor of § 7116(a)(3) when it failed to prevent a rival union from publishing an advertisement celebrating its advantages in an un-

official Air Force newspaper. The Authority noted that the Air Force's contract with the paper's publisher gave control over the paper's news and editorial content to the Air Force, but reserved to the private publisher decisions on advertising sales and copy. *Id.* at 408. Thus, characterizing the Air Force's conduct as a "failure to prevent the selling of an advertisement by a private individual ... to appear in an unofficial newspaper published in the interests of personnel," *id.* at 412, the FLRC determined that the purposes of § 19(a)(3) were not implicated by the Air Force's conduct. There, as here, the agency's conduct essentially amounted to neutrality in areas beyond the agency's direct control. Thus, *Grissom* supports the Authority's decision in the instant case.[7]

Moreover, the FLRA's decision here is fully consistent with the policies that underlie § 7116(a)(3). Contrary to petitioner's assertion that § 7116(a)(3) is intended to "insulat[e] the exclusive representative from challenges by rival unions," Petitioner's Brief at 12, the provision is aimed primarily at preventing agency domination of unions and preserving the bargaining representative's independence. *Department of the Air Force, Grissom Air Force Base, Peru, Indiana,* 6 FLRC 406, 412 (1978) (citing Explanation of Provisions of the Standards of Conduct for Employer Organizations and Code of Fair Labor Practices in Employee–Management Cooperation in the Federal Service,[8] United States Civil Service Commission, Attachment to FPM Let. 711–2 (Aug. 30, 1963) at

---

7. Petitioner's reliance on *Library of Congress v. FLRA,* 699 F.2d 1280 (D.C.Cir.1983), is unavailing. There we held that union proposals involving action by the Architect of the Capitol that were not exclusively within the control of the agency were "conditions of employment affecting [agency] employees" and hence proper subjects for collective bargaining. We noted that Congress had created a broad duty to bargain about matters concerning employment conditions with several enumerated exceptions. *See* 5 U.S.C. § 7103 (1982). Because the union's proposals clearly were broadly related to employment conditions and were not covered by the exceptions, we concluded that Congress intended them to be proper subjects of bargaining. Here, in an entirely separate provision

with different ancestry and purposes, Congress has forbade agency "assist[ance]" of a rival labor organization, a term that on its face does not require affirmative action in *opposition* to rival unions. Thus, that an agency may be required under § 7103 of the Statute to bargain about actions it will take under a new collective bargaining agreement tells us nothing about what constitutes "assistance" to a rival union.

8. The Code of Fair Labor Practices was the predecessor of Executive Order No. 11,491. *See* Committee on Post Office and Civil Service, 96th Cong., 1st Sess., *Legislative History of the Federal Sector Labor–Management Relations Statute* 1167 (Committee Print 1979).

16); *Department of the Army, United States Army Natick Laboratories, Natick, Massachusetts*, 3 A/SLMR 193, 196 (1973); *see also AFGE I*, 793 F.2d at 337. Like its analogue in private sector labor law, § 8(a)(2) of the National Labor Relations Act, 29 U.S.C. § 158(a)(2) (1982), it is directed at the problem of "company unions." *Cf.* R. Gorman, *Basic Text on Labor Law* 195–96 (1976).

We think the FLRA's decision effectuates these purposes. It does not give an agency the ability to help unseat an uncooperative incumbent union; it merely allows the agency to maintain a position of neutrality between battling labor organizations in areas beyond its effective control.

Moreover, adoption of AFGE's theory would lead to very difficult line-drawing problems. Would an agency have to take up the incumbent union's case with the National Park Service, if the agency were adjacent to property under its domain? Why should the duty be limited to government property owners? How ardently must the agency plead the incumbent union's case? Only a clear command from Congress would require the FLRA to enter this tangle; there is instead no perceptible command at all.

We therefore uphold the Authority's conclusion that § 7116(a)(3) does not require an employer agency to attempt to persuade its landlord to deny a rival union access to areas not under the agency's control.

\* \* \*

Finding no infirmity in the decision of the Authority, we deny AFGE's petition for review.

MYRON L. GORDON, Senior District Judge, dissenting:

I respectfully dissent. I believe that the FLRA's determination that the solicitation conducted by NTEU in the public areas contiguous to HCFA's workplaces was not of a type that HCFA could control is not supported by substantial evidence. Consequently, I believe that HCFA committed an unfair labor practice under 5 U.S.C. § 7116(a)(3) by remaining neutral and failing to exercise its control over NTEU organizers.

The relevant statutory and regulatory schemes are not neutral; they contemplate protection of the exclusive representative by an employer-agency until such time as a rival union achieves "equivalent status."

> [I]t shall be an unfair labor practice for an agency ... to sponsor, control, or otherwise assist any labor organization, other than to furnish, upon request, customary and routine services and facilities if the services and facilities are also furnished on an impartial basis to another labor organization having equivalent status.

5 U.S.C. § 7116(a)(3).

The litany of interpretative precedent set forth in the majority opinion clearly establishes that a public employer commits an unfair labor practice by providing access to its facilities, or facilities within its control, to a union without equivalent status. *See* Majority opinion at 950.

Moreover, 41 C.F.R. § 101–20.308(c) [section 308(c)], which prohibits, generally, solicitation in "GSA-controlled" property, provides a specific exception for "solicitation of labor organization membership or dues *authorized by occupant agencies....*" *Id.* (emphasis added). Thus, while the public areas occupied by NTEU organizers ordinarily would be within the control of GSA, solicitation of union membership in such areas must be authorized by HCFA, the primary occupant-agency. It cannot be disputed, therefore, that at least with respect to the latter activity, otherwise GSA-controlled property is in fact occupant-agency controlled.

Based on its review of an amicus brief submitted by the GSA Office of General Counsel and the testimony of Scott Schaefer, an NTEU organizer, the FLRA arrived at the extraordinary conclusion that NTEU's activities in the so-called public areas of the East Low Rise were merely solicitations for *signatures* and not solicitations for *membership*. The majority accepts this remarkable conclusion by dismantling the membership process into three steps and then suggesting that the solicitation of signatures, only the first

step of the process, is "far too remote from the future solicitation of members to fit within the plain language of the § 308(c) exception." Majority opinion at 952.

I believe that the majority's analysis in this regard is artificial; it unnecessarily obfuscates a simple concept. As I read it, the plain language of the governing regulation does not impose a requirement of immediate result with respect to the steps involved in solicitation of membership; neither should this court.

What is plain is that NTEU's ultimate objective was a solicitation of membership. To what other end would this rival union be expending its resources? Scott Schaefer explained the general nature of the petition that was circulated in the Baltimore complex:

> [T]hat's the petition which we ask people to sign, and in doing do [sic], we explain to them that this is a petiion [sic] to hold a secret ballot election, at which time the employees would determine if they wanted to elect NTEU to be their union, if they wanted to retain the incumbent—in this case, the American Federation of Government Employees—or if they wanted no union.

Joint Appendix at 125.

In his testimony, Mr. Schaefer acknowledges that he and other NTEU organizers were not simply soliciting signatures; they were taking the first step towards gathering the support and membership of AFGE members and HCFA employees. That Mr. Schaefer's testimony also includes a denial of soliciting membership per se is hardly controlling; his testimony on this point is conclusory and must be scrutinized carefully in light of his union's obvious interest in the outcome of this matter.

In affirming the FLRA's interpretation of section 308(c), the majority also accords the GSA's amicus brief a "modicum of respect" and believes "its construction to be decidedly the better view." I disagree. As the majority recognizes, the brief is an unofficial statement of the GSA Office of General Counsel. Even *official* GSA interpretations of its governing regulations are entitled to no judicial deference if they are "plainly inconsistent with the wording of the regulation[ ]." *United States v. Larionoff,* 431 U.S. 864, 872–73, 97 S.Ct. 2150, 2155–56, 53 L.Ed.2d 48 (1977). *A fortiori,* unofficial statements setting forth regulation interpretation are entitled to no deference if they are plainly inconsistent with the language of the regulation at issue. For the reasons outlined above, I construe the GSA's unofficial interpretation to be plainly inconsistent with the wording of the regulation, and I therefore would reject it.

Having determined that HCFA had the necessary authority to grant or deny NTEU's access to the otherwise GSA-controlled areas of the Baltimore complex, I am persuaded that HCFA was obligated by law to exercise control. The FLRA should have required HCFA to utilize its presence in the areas in question to bar NTEU's solicitation of membership, albeit indirect or unrealized. The Federal Labor Relation Authority's failure to arrive at this decision is reversible error.