**Lyndon H. LaROUCHE; LaRouche Democratic Campaign '88, Petitioners,**

v.

**FEDERAL ELECTION COMMISSION, Respondent.**

No. 92–1555.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 7, 1994.

Decided July 8, 1994.

Harold R. Mayberry, Jr., Washington, DC, argued the cause and filed the briefs for petitioners.

Richard B. Bader, Associate Gen. Counsel, Federal Election Commission ("FEC" or "Commission"), Washington, DC, argued the cause for respondent. With him on the brief was Lawrence M. Noble, Gen. Counsel, FEC, Washington, DC.

Before EDWARDS, BUCKLEY, and GINSBURG, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

Petitioners Lyndon H. LaRouche and the LaRouche Democratic Campaign '88 petition for review of the Federal Election Commission's determination that they must repay $109,148.88 in federal matching funds paid to the campaign in connection with Mr. La-Rouche's unsuccessful bid for the Democratic Party's 1988 presidential nomination. The Commission found that the repayment was required by a regulation governing the computation of matching payments a candidate, who has otherwise lost his eligibility for such payments, is entitled to receive in order to retire pre-existing campaign obligations. Because we find the Commission's regulation, as construed, to be permissible under the governing statute, we deny the petition.

## I. BACKGROUND

### A. Legal Framework

The Presidential Primary Matching Payment Account Act ("Act"), 26 U.S.C. §§ 9031–42 (1988), provides partial federal financing for the campaigns of qualifying presidential primary candidates. Broadly speaking, the Federal Election Commission will certify a candidate as eligible to receive federal "matching" funds equal to individual contributions of $250 or under, provided that the candidate meets the requisite conditions. *See id.* §§ 9036, 9034, and 9033. Candidates may use these matching funds only to defray "qualified campaign expenses." *Id.* § 9042(b).

A candidate may lose his eligibility to receive matching funds under two circumstances: when the candidate no longer actively seeks nomination, *id.* § 9033(c)(1)(A), or after he receives less than ten percent of the vote in two consecutive primary elections. *Id.* § 9033(c)(1)(B). In the latter case, funding is terminated thirty days after the second election—the "date of ineligibility" ("DOI"). *Id.* But even after the DOI, a candidate "shall be eligible to continue to receive

[matching funds] to defray qualified campaign expenses incurred before the date upon which such candidate becomes ineligible...." *Id.* § 9033(c)(2).

The Commission's regulations implementing section 9033(c)(2) provide that if, on the DOI, a candidate has "net outstanding campaign obligations" as defined therein,

> that candidate may continue to receive matching payments for matchable contributions received and deposited on or before December 31 of the Presidential election year provided that on the date of payment there are remaining net outstanding campaign obligations, i.e., the sum of contributions received on or after the date of ineligibility plus matching funds received on or after the date of ineligibility is less than the candidate's net outstanding campaign obligations.

11 C.F.R. § 9034.1(b). "Net outstanding campaign obligations" ("NOCO") is defined as

> [t]he total of all outstanding obligations for qualified campaign expenses as of the candidate's date of ineligibility ... plus estimated necessary winding down costs ... less ... [t]he total of: (i) Cash on hand as of the close of business on the last day of eligibility ...; (ii) The fair market value of capital assets and other assets on hand; and (iii) Amounts owed to the [campaign] committee....

*Id.* § 9034.5(a). Thus, the candidate's NOCO is essentially equal to the amount of his campaign's qualified obligations as of the date of ineligibility less the value of its assets on that date. The regulations limit a candidate's entitlement to post-DOI matching funds "to the lesser of: (1) the amount of contributions submitted for matching; or (2) the remaining net outstanding campaign obligations." *Id.* § 9034.1(b)(1), (2).

**B. The Facts**

Lyndon H. LaRouche waged an unsuccessful bid for the Democratic Party's 1988 presidential nomination. On March 25, 1988, the Commission certified him to be eligible to receive matching funds under the Act. Soon thereafter, Mr. LaRouche received less than ten percent of the votes in two consecutive primaries. Accordingly, on May 2, 1988, the Commission determined that he had lost his eligibility under the Act and established his DOI as May 26, 1988. Because petitioners had a NOCO of $332,021.96 on that date, however, they qualified to receive additional matching funds to defray this debt; and the Commission continued to certify their requests. In total, the LaRouche campaign received $189,659.70 in matching funds after his DOI.

In a post-election audit, the Commission determined that by July 22, 1988, petitioners had received enough in private contributions and matching payments since the DOI to eliminate their NOCO; namely, $251,511.14 in private contributions and $80,510.82 in matching funds. The Commission concluded from this that petitioners were not entitled to receive federal matching funds after that date. On September 17, 1992, the Commission made a final determination that petitioners must repay the United States Treasury a total of $151,259.76, of which $109,148.88 represented matching funds received by them in excess of their entitlement ("Final Payment Determination"). Petitioners challenge their obligation to repay the latter amount as contrary to both the Act and its implementing regulations.

**II. DISCUSSION**

■ As a preliminary matter, we must dispose of a motion filed by the Commission shortly before oral argument. It asked the court to strike section III of petitioners' reply brief because it presented an argument for setting aside the Final Payment Determination that had not been advanced in their opening brief. In section III, petitioners assert that that determination was invalid because it had been made by an illegally constituted Commission, citing our recent decision in *Federal Election Comm'n v. NRA Political Victory Fund,* 6 F.3d 821 (D.C.Cir. 1993). In *NRA,* we held that the FEC did not have the authority to bring a civil enforcement action because its composition violated the constitutional doctrine of the separation of powers.

Petitioners acknowledge that it is our practice not to consider any issue raised for the first time in a reply brief. *See McBride v. Merrell Dow and Pharmaceuticals, Inc.,* 800 F.2d 1208, 1210 (D.C.Cir.1986) (this court "generally will not entertain arguments omitted from an appellant's opening brief and raised initially in his reply brief"). They argue, nonetheless, that because the FEC was improperly constituted, it lacked the jurisdiction to order a refund; as a consequence, they assert the right to raise the issue at any time, citing a host of cases dealing largely with the right (and obligation) of an Article III court to consider the question of its own jurisdiction whenever challenged. *NRA,* however, dealt not with our authority to consider the FEC's enforcement action but with its authority to bring it. *NRA,* 6 F.3d at 822.

Petitioners candidly admit that they chose not to raise this challenge in their opening brief because of what they perceived to be the complexity of the issues implicated in the *NRA* decision. That, however, was their choice; and because their argument does not raise an issue "of grave public import or [one that] would otherwise [result in] a miscarriage of justice," *Environmental Defense Fund v. Costle,* 657 F.2d 275, 284 n. 32 (D.C.Cir.1981) (citations omitted), we see no reason to depart from our customary rule. Accordingly, we grant the FEC's motion.

■ On the merits, petitioners question the Commission's determination that the amount of an ineligible candidate's post-DOI private contributions must be applied against his NOCO. They argue that a fair reading of both section 9033(c)(2) of the Act and section 9034.1 of the regulations entitles them to collect matching payments on post-DOI contributions with which to pay off their NOCO without at the same time being required to credit those contributions against the amount of the NOCO remaining due.

We will address, first, the argument that the Commission has misapplied its own regulations. The relevant provision, section 9034.1(b), states that a candidate may continue to receive post-DOI matching payments

provided that on the date of payment there are remaining [NOCO], i.e., the *sum of the contributions received* on or *after* the date of ineligibility *plus matching funds received* on or *after* the date of ineligibility *is less than the candidate's [NOCO].*

11 C.F.R. § 9034.1(b) (emphasis added).

This language would appear to be dispositive. A candidate is entitled to receive post-DOI matching payments so long as net campaign obligations remain outstanding; and the regulation defines a candidate's "remaining [NOCO]" as the difference between the amount of his original NOCO and "the sum of the contributions received ... plus matching funds received." Under this calculus, it is irrelevant how a candidate chooses to spend his post-ineligibility contributions. Whenever the sum of his post-DOI receipts equal the amount of his NOCO—whether those receipts be in the form of private contributions or matching payments from the public fisc—his entitlement to further matching payments comes to an end. Even if we were to find the regulation ambiguous, which we do not, we would still have to accept the Commission's interpretation of section 9034.-1(b) unless we found it "plainly inconsistent with the wording of the regulation," *American Fed'n of Gov't Employees v. FLRA,* 840 F.2d 947, 952 (D.C.Cir.1988), which it is not.

Having concluded that the Commission's interpretation of its regulations is not merely reasonable, but compelling, we must determine whether the regulations, as construed, represent a permissible interpretation of the Act. *See Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). According to petitioners, the regulation, as interpreted by the FEC, represents an impermissible application of the Act. Specifically, they cite the language of section 9033(c)(2), which provides that any candidate who becomes ineligible for matching payments by virtue of receiving less than ten percent of the vote in two succeeding primary elections *"shall be eligible to continue to receive payments ...* to defray qualified campaign expenses incurred before the date upon which such candidate became ineligible...." 26 U.S.C. § 9033(c)(2) (emphasis added). They then acknowledge that "[t]his provision of the Act

does not expressly address the use of private contributions received from the date of ineligibility" but assert that the Commission's interpretation frustrates the intent of the Act "to encourage participation in the American political system." Brief for Petitioners at 16–17. They insist that the Act's policy is "to encourage participation in the American political system," *id.* at 17, and "to facilitate and broaden public debate and thereby bring about an informed electorate," *id.* at 18; and they maintain that the Commission's regulations impermissibly contravene these policies by limiting Mr. LaRouche's ability to continue his campaign.

█ There is a one-word response to these arguments: *"Chevron."* It is precisely when a statute "does not expressly address" the issue at hand that the Supreme Court requires deference to an agency's filling of a statutory gap:

"The power of an administrative agency to administer a congressionally created … program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress."

*Chevron*, 467 U.S. at 843, 104 S.Ct. at 1782 (quoting *Morton v. Ruiz*, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974)). Thus, if Congress has not addressed a specific issue, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782.

Here, petitioners have failed to cite anything in either the language or structure of the Act that would render the Commission's interpretation of section 9033(c)(2) unreasonable. To the contrary, its provisions make it clear that Congress wished to restrict the availability of matching payments to candidates it considered viable. Thus the Act expressly limits the class of those who are eligible for funds, 26 U.S.C. § 9033, and it withdraws the eligibility of candidates who fail to receive at least ten percent of the vote in two successive primaries. *Id.* § 9033(c)(1)(B). Under the circumstances, we fail to discern why it was impermissible for the Commission to adopt a regulation that terminates post-DOI matching payments

as soon as a candidate has received sufficient funds from private and public sources to liquidate his NOCO, whether or not they are so used. As for the expansive purposes petitioners would have us impute to the Act, we merely note the Supreme Court's observation that Congress vests the responsibility for implementing its statutory policies in the agencies charged with their administration, not in the courts. *See Chevron*, 467 U.S. at 843–44, 104 S.Ct. at 2781–83.

█ Petitioners raise additional arguments, which we reject in turn. They note that, in 1991, the Commission amended its regulations to modify the formula for allocating post-DOI private contributions to the reduction of the NOCO. *See* Public Financing of Presidential Primary and General Election Candidates, 56 Fed.Reg. 35898, 35905 (1991). Petitioners urge that this change evidences the previous regulations' inconsistency with the Act. We are not persuaded. "An administrative agency is not disqualified from changing its mind." *NLRB v. Local 103, Int'l Ass'n of Bridge Workers*, 434 U.S. 335, 351, 98 S.Ct. 651, 660–61, 54 L.Ed.2d 586 (1978). The mere fact that regulations were modified, without more, is simply not enough to demonstrate that the prior regulations were invalid.

Next, they argue that the Commission's interpretation of 11 C.F.R. § 9034.1(b) was a *de facto* rulemaking. They assert that the Commission created a new rule having substantive effect when it determined that petitioners had received $109,149 in excess matching payments; that the new rule represented a departure from past agency practices; that it was adopted without benefit of notice and comment; and, finally, that it was applied retroactively. The most basic problem with this challenge is that petitioners' premise is flawed. As Mr. LaRouche should have recalled, the Commission applied the identical interpretation of section 9034.1(b) to collect $36,958.19 in overpayments from his 1980 presidential campaign. Brief for Respondent at 21 (citing Final Audit Report, *Citizens for LaRouche* at 25 (Mar. 17, 1981)).

Petitioners attempt to distinguish the application of section 9034.1(b) in 1980 from

that in 1988 on the basis that in the latter year, Mr. LaRouche continued to seek the Democratic presidential nomination despite his ineligibility for further matching payments other than those authorized by section 9033(c)(2). They also refer to intervening changes in requirements for updating the calculation of the NOCO. In short, petitioners assert that the Commission was engaged in a rulemaking simply because it was required to apply an existing rule to somewhat novel circumstances.

■ As we have repeatedly held, "an agency may, in its discretion, choose to make new policy through either rulemaking or adjudication." *Bechtel v. FCC*, 957 F.2d 873, 881 (D.C.Cir.1992). Although the Final Payment Determination represented an adjudication, it stretches things to assert that it resulted in the establishment of a new rule. Rather, the Commission in effect concluded that the existing rule was not affected by Mr. LaRouche's decision, in 1988, to continue the good fight rather than to wind up his campaign, as he had done eight years earlier.

■ Having concluded that the Commission had not enunciated a new rule, we move on to petitioners' invocation of the doctrine of estoppel. Specifically, they note that the financial information submitted with their requests for post-DOI matching payments provided the Commission with full information as to the amount of their NOCO and of their post-DOI contributions. They then argue that because the Commission certified the matching payments it is now trying to recover, petitioners were warranted in accepting the payments as properly made and in acting in reliance on that understanding. A private party asserting estoppel against the United States Government must demonstrate, however, that the latter has engaged in "affirmative misconduct," *Conax Florida Corp. v. United States*, 824 F.2d 1124, 1131 (D.C.Cir. 1987) (citing *INS v. Miranda*, 459 U.S. 14, 17, 103 S.Ct. 281, 282–83, 74 L.Ed.2d 12 (1982)). None is alleged here.

■ Petitioners also assert a statutory basis for their estoppel claim, citing section 438(e) of the Federal Election Campaign Act. That section reads as follows:

Notwithstanding any other provision of law, any person who relies upon any rule or regulation prescribed by the Commission in accordance with the provisions of this section and who acts in good faith in accordance with such rule or regulation shall not, as a result of such act, be subject to any sanction provided by this Act or by chapter 95 or chapter 96 of Title 26.

2 U.S.C. § 438(e) (1988). They maintain that because they acted in good faith reliance on the Commission's regulations and procedures, section 438(e) bars the FEC's claim for repayment. The statute requires more than that, however; all the good faith in the world will not save petitioners because the request that they repay the post-July 22, 1988, matching funds was not a sanction. Moreover, it cannot be said that petitioners acted in reliance on the FEC's regulation. At best, they acted in reliance on their misunderstanding of the regulation.

## III. CONCLUSION

For the foregoing reasons, we deny the petition for review.

*So ordered.*