**NATIONAL TREASURY EMPLOYEES UNION, et al., Appellants,**

v.

**Gwendolyn S. KING, Administrator, Social Security Administration, et al.,**

**American Federation of Government Employees, AFL–CIO, Intervenor.**

No. 91–5352.

United States Court of Appeals, District of Columbia Circuit.

Argued March 2, 1992.

Decided March 31, 1992.

Rehearing Denied April 28, 1992.

Elaine Kaplan, with whom Gregory O'Duden, Washington, D.C., was on the brief for appellants. Clinton Wolcott, Washington, D.C., also entered an appearance for appellants.

Daniel J. Standish, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief for appellees.

Charles A. Hobbie, with whom Mark D. Roth and Alexia McCaskill, Washington, D.C., were on the brief for intervenor.

Before WALD, SENTELLE and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

The National Treasury Employees Union ("NTEU" or "union") seeks to distribute leaflets to employees of the Social Security Administration ("SSA") on the sidewalks within the Woodlawn federal complex near Baltimore, Maryland. The SSA has repeatedly denied the NTEU's permit application for access to the Woodlawn grounds, asserting that federal labor statutes prevent it from allowing the access because the American Federation of Government Employees, AFL–CIO ("AFGE") has been designated the exclusive bargaining representative of the SSA employees. The NTEU petitioned the General Counsel of the Federal Labor Relations Authority ("FLRA") to bring an unfair labor practice proceeding against the SSA because of its refusal to grant the permit. That administrative proceeding is currently underway before the FLRA.

In the meantime, the NTEU has itself brought a lawsuit seeking injunctive relief in federal district court, alleging a violation of its First Amendment rights. Without reaching the merits of the constitutional controversy, the district court dismissed the union's complaint because it had failed to exhaust its administrative remedy in the FLRA proceeding. While we basically agree with the district court regarding the usefulness of completing the administrative proceeding in this case, we have concluded that an alternative resolution to dismissal of the complaint will better serve the interests of justice. It is unpredictable at the present time whether the FLRA proceeding will adequately redress the union's alleged constitutional injuries. More specifically, NTEU may suffer irreparable injury if the administrative proceeding does not reach closure within the near future. Accordingly, we are remanding the case to the district court with an instruction that the union's complaint be maintained on its docket in a suspended state, *see Natural Resources Defense Council, Inc. v. Train,* 510 F.2d 692, 703 (D.C.Cir.1975), pending resolution of the unfair labor practice proceeding before the FLRA. If within three months from the date of this opinion, *i.e.,* June 30, 1992, (1) the FLRA decides that the NTEU may not distribute leaflets to the SSA employees at Woodlawn, or (2) the FLRA has not issued its decision by that date, the NTEU may move for reconsideration of its motions for injunctive relief by the district court.

## I. BACKGROUND

Since 1988, the NTEU has engaged in a nationwide effort to supplant the AFGE as the exclusive bargaining representative for approximately 49,000 federal employees working for the SSA. The federal labor relations statute provides that in order to compel a new election to decide which union will represent the SSA employees, the NTEU must compile signatures from thirty percent of all SSA employees nationwide. 5 U.S.C. § 7111 (1988). Such a petition signed by 15,000 employees must, moreover, be filed three months before the end of the existing collective bargaining agreement between the SSA and its employees. *See* 5 U.S.C. § 7111(f). Currently the NTEU faces a deadline of November, 1992 by which it must garner the signatures and file its election petition.

As the first part of its organizing campaign, the NTEU desires to establish contact with the 14,000 SSA employees who work at the national SSA headquarters by passing out leaflets containing union information on the grounds of the Woodlawn complex.[1] The General Services Adminis-

---

1. The geographic layout of the Woodlawn facili-

ty makes it impractical to distribute leaflets on

tration ("GSA") owns the property at Woodlawn. GSA has entered into a delegation agreement with the Department of Health and Human Services ("HHS"), of which the SSA is a part, under which the SSA manages the property. Under the agreement, the Federal Property Management Regulations, 41 C.F.R. § 101 (1991), govern SSA's "management, operation, protection, and maintenance" of buildings and grounds at the Woodlawn complex. 41 C.F.R. § 101–20.100. The regulations also establish rules "for the occasional use of public areas for cultural, educational, and recreational activities." 41 C.F.R. § 101–20.400. *Inter alia,* the regulations establish a permit system by which an interested party may access public areas on the federal property. *See* 41 C.F.R. § 101–20.401. A party desiring access to the property must apply to the property manager, and provide specific information concerning the proposed activity.[2]

In May, August, and October of 1991, the NTEU applied to the SSA for permits to distribute its union leaflets at the Woodlawn complex. The union requested that its organizers be allowed to gather two mornings per week on the sidewalks traversed by SSA employees as they walk from the parking lots and the Metro bus stop to their workplaces. On each occasion the SSA denied the permits on the ground that, as a contender to the existing representative union, the NTEU was required to

show that it was unable to contact the employees away from their workplace, but had failed to do so.

In October 1991, after the SSA's successive denials of its permit request, the NTEU filed an unfair labor practice charge against the SSA with the FLRA.[3] The FLRA issued a complaint and set a hearing date for December 1991. In order to accelerate the process, the parties stipulated to the facts, obviating the need for hearings before an administrative law judge. The FLRA then set February 10, 1992 as the due date for original briefs and March 6, 1992 for reply briefs.

Concurrently with the NTEU's filing of its unfair labor practice charge with the FLRA, it commenced this lawsuit seeking a preliminary injunction or temporary restraining order against the SSA and GSA to vindicate its claimed First Amendment right. The NTEU argues that the SSA is violating the union's First Amendment right of free speech because the Woodlawn grounds are a public forum as to which government authority to regulate speech is narrowly circumscribed. The district court dismissed the NTEU's complaint without reaching the merits of its First Amendment argument on the ground that the exhaustion doctrine requires that the union wait the termination of the FLRA proceeding before a federal court may entertain its petition.

---

the public sidewalks surrounding the facility. SSA employees park on lots within the complex and walk from there to their office buildings. Attempting to distribute the leaflets from the public sidewalks to moving cars is neither feasible nor safe. The NTEU has applied for permits allowing its organizers to contact SSA employees walking from the parking lots to their office building entrances.

**2.** The regulations provide that a permit may be denied for several reasons: failure to submit all necessary information, if the proposed use is a commercial activity, is obscene, is intended to influence judicial proceedings, or is considered a political solicitation in violation of 18 U.S.C. § 607. *See* 41 C.F.R. § 101–20.402(a). The permit must also be disapproved if the proposed activity "interferes with access to the public area, disrupts official government business, interferes with approved uses of the property by the tenants, or damages the property." *Id.*

Also, a permit may not be given for any conduct that "impedes or disrupts the performance of official duties by Government employees" or that "prevents the general public from obtaining the administrative services provided in a timely manner." 41 C.F.R. § 101–20.305.

**3.** The NTEU brought its charge of an unfair labor practice under the federal labor relations statute which provides that:

it shall be an unfair labor practice for an agency—
to interfere with, restrain, or coerce any employee in the exercise by the employee of any right under this chapter; [or] to sponsor, control, or otherwise assist any labor organization, other than to furnish, upon request, customary and routine services and facilities if the services and facilities are also furnished on an impartial basis to other labor organizations having equivalent status.

5 U.S.C. § 7116(a)(1) & (3) (1988).

## II. DISCUSSION

### A. *Subject Matter Jurisdiction*

■ As an initial matter, we reject the government's contention that the district court's dismissal of this action should be affirmed on the ground that federal question jurisdiction does not extend to the subject matter of the NTEU's action. The government argues that because the NTEU's statutory claim is within the exclusive jurisdiction of the FLRA, *see Karahalios v. National Federation of Federal Employees, Local 1263*, 489 U.S. 527, 109 S.Ct. 1282, 103 L.Ed.2d 539 (1989), the union's constitutional claim as well is barred. In *National Federation of Federal Employees v. Weinberger*, 818 F.2d 935, 940 (D.C.Cir.1987), *cert. denied*, 493 U.S. 1056, 110 S.Ct. 864, 107 L.Ed.2d 948 (1990), we repudiated a similar argument as a "discredited theory of subject matter jurisdiction," and specifically stated that our decisions "made it absolutely clear that federal employees may seek to enjoin governmental actions that violate their constitutional rights." This court's decision in *Steadman v. Governor, U.S. Soldiers and Airmen's Home*, 918 F.2d 963 (D.C.Cir.1990), does not hold otherwise. In *Steadman* we addressed and clarified the strictures of the exhaustion doctrine, but in so doing we recognized that federal district courts clearly retain subject matter jurisdiction both when exhaustion has been satisfied but the administrative proceeding has left the constitutional injury unremedied, and when an administrative proceeding cannot adequately redress the alleged constitutional violation. Subject matter jurisdiction, thus, presents no insurmountable hurdle to the NTEU's claim. The more significant barrier facing the NTEU, as the district court recognized, involves exhaustion.

### B. *Exhaustion*

The doctrine of exhaustion of administrative remedies concerns the *timing* rather than the jurisdictional authority of federal court decisionmaking. In general, the doctrine requires a party to exhaust prescribed administrative remedies before seeking relief in federal courts. *See, e.g., Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51 & n. 9, 58 S.Ct. 459, 463–464 & n. 9, 82 L.Ed. 638 (1938). The principle of exhaustion rests on the dual purposes of protecting administrative agency authority and promoting the economy of judicial resources. *See McCarthy v. Madigan*, — U.S. —, —, 112 S.Ct. 1081, 1086, 117 L.Ed.2d 291 (1992).

■ The fact that the NTEU's claim involves constitutional rights not adjudicable in the administrative hearing does not *per se* alter the exhaustion requirement. *Wallace v. Lynn*, 507 F.2d 1186, 1190–91 (D.C.Cir.1974). This court has held that when an alleged constitutional violation "is intertwined with a statutory one, and Congress has provided machinery for the resolution of the latter," the plaintiff must exhaust its administrative remedy before the district court may hear its case. *Steadman*, 918 F.2d at 963; *Wallace v. Lynn*, 507 F.2d at 1189–90. In other words, when the statutory and constitutional claims are "premised on the same facts" and "the administrative process [is] fully capable of granting full relief," exhaustion is required. *See Andrade v. Lauer*, 729 F.2d 1475, 1493 (D.C.Cir.1984).

■ The NTEU does not dispute that the alleged violation of its First Amendment right stems from the same underlying facts as its unfair labor practice claim before the FLRA. Neither does the union contend that the FLRA is without authority to fully remedy its lack of access to the Woodlawn grounds. The NTEU argues, however, that the exigencies of time in this case present a classic exception to any rigid application of the exhaustion doctrine, *i.e.*, if the union is required to wait indefinitely for the agency to act, the deadline for organizing its campaign and presenting its representative petition will pass and it will lose the entire *raison d'etre* for its First Amendment exercise.

Exhaustion is indeed a "flexible doctrine," in which congressional intent is of "paramount importance," and in which "sound judicial discretion governs when Congress has not clearly required other-

wise." *See Patsy v. Board of Regents,* 457 U.S. 496, 501, 102 S.Ct. 2557, 2560, 73 L.Ed.2d 172 (1982); *McGee v. United States,* 402 U.S. 479, 483 n. 6, 91 S.Ct. 1565, 1568 n. 6, 29 L.Ed.2d 47 (1971); *Ticor Title Ins. Co. v. FTC,* 814 F.2d 731, 738–43 (D.C.Cir.1987) (opinion of Edwards, J.). The Supreme Court recently reviewed "the three broad sets of circumstances" in which exceptions to the exhaustion requirement for federal court jurisdiction are legitimate. *See McCarthy v. Madigan,* —— U.S. at ——, 112 S.Ct. at 1087. Relevant for our purpose is the Court's acknowledgment that where "a particular plaintiff may suffer irreparable harm if unable to secure immediate judicial consideration of his claim," he need not resort to the administrative remedy. *Id.; see also Bowen v. New York,* 476 U.S. 467, 483, 106 S.Ct. 2022, 2032, 90 L.Ed.2d 462 (1986) (disability-benefit claimants "would be irreparably harmed were the exhaustion requirement now enforced against them").

The NTEU argues that it need not exhaust its FLRA remedies because it is continuously suffering irreparable injury to its First Amendment rights that cannot be remedied by any later agency recognition of its right to pamphleteer. Specifically, the NTEU contends that the delays to its free speech right are irreparable because the union's organizational effort to gather the signatures needed by November 1992 is irremediably hampered by its inability to make the necessary contacts with the largest core group of employees now, by distributing leaflets at the SSA headquarters.

### C. *Is the Union's Injury Irreparable?*

The NTEU asserts that the SSA's refusal to grant its permit application prevents it from communicating with the SSA employees at Woodlawn in violation of its First Amendment rights. The union correctly points out "that 'the loss of First Amendment freedoms, for even minimal periods of time,' may constitute irreparable injury." *National Treasury Employees Union v. United States,* 927 F.2d 1253, 1254 (D.C.Cir.1991) (quoting *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976)). While we are sympathetic to the NTEU's view that any delay in the exercise of its right to engage in free speech can be potentially harmful, we are not persuaded that, standing alone, the normal administrative delay involved in pursuing its remedy with the FLRA will always rise to the level of irreparable injury as a matter of law.[4] For example, if the deadline for signatures to force an election were November 1993 instead of November 1992, it would be difficult to see how the few months required to finish the administrative proceeding could produce any serious, let alone irreparable, injury.

This very hypothetical, however, illuminates the real nature of the threat to the NTEU's interests. The NTEU may be caught in a squeeze play between the delay involved in exhausting its administrative remedy—which could conceivably take several months more, and the current deadline of November 1992 by which time it must file its petition for election with the required 15,000 signatures. If the FLRA fails to reach a final decision in time for the NTEU to distribute its information and gather signatures, the NTEU will indeed have suffered a grievous harm through the intervening loss of its free speech rights (assuming of course that it is eventually decided that the First Amendment has been violated by the SSA's denial of access). The NTEU argues that we must therefore reach the merits of its constitutional claim now, because the administrative proceeding will take too long to provide it any effective relief.

We disagree. "The FLRA clearly has broad remedial power in the case of an unfair labor practice claim to make the injured employee whole." *Steadman,* 918 F.2d at 966. *See* 5 U.S.C. § 7118(a)(7). That remedial authority includes the ability to postpone the filing deadline or the elec-

---

4. In a previous case we noted that the inevitable delay involved in conducting an administrative proceeding generally cannot by itself rise to the level of harm irreparable enough to avoid the exhaustion doctrine. *See Randolph–Sheppard Vendors of America v. Weinberger,* 795 F.2d 90, 108–09 (D.C.Cir.1986).

tion itself if the FLRA finds that the SSA has violated the NTEU's statutory rights. The NTEU in fact has advised us that it has already petitioned the FLRA to extend the deadline for the election for an additional period of time equal to that for which it has been denied access to the Woodlawn grounds. The NTEU has also filed a motion to expedite the unfair labor practice proceeding; furthermore, as of now there is no indication that the FLRA has failed to employ all due diligence in resolving this dispute in a time and manner calculated to alleviate or remedy the NTEU's alleged injuries.

On the other hand, to affirm the district court's dismissal of the NTEU's complaint could leave the union with no remedy but to refile its lawsuit if the FLRA does not decide its claim in the immediate future or postpone the time for filing its election petition. If the NTEU continues to face a November 1992 deadline without access to the Woodlawn grounds throughout the summer, and assuming it has a legitimate claim to access to the complex, its ability to organize a campaign will be irreparably damaged. There appears to be merit in the NTEU's argument that its loss of organizing time on the front end cannot be made up by doubled or tripled efforts in the period immediately preceding the election. At the time of the district court's original decision, the election was still more than a year away; as of now it is only seven and a half months away. That convergence of a definite deadline for the union and no comparable deadline for the FLRA's action compels us to direct that the complaint be held in abeyance by the district court until one of several events occurs.

### III. Conclusion

We reverse the district court's order dismissing the NTEU's complaint; and order that the action be maintained on its docket, for a period of three months from the date this opinion issues, *i.e.,* until June 30, 1992, or until the FLRA reaches a final decision in the NTEU's unfair labor practice proceeding at an earlier date. If by the June date the FLRA has not acted on the unfair

labor practice, the union may renew its motions for injunctive relief in the district court. In considering any such future motions, the district court should also take account of whether the union's petition to extend the deadline for filing the election petition has been granted, denied or is still pending. Finally, if the FLRA acts to deny the union access to the Woodlawn complex, the district court should entertain its constitutional claim.

This compromise reflects our keen interest in balancing the need for the administrative proceeding to complete its course, against the possibly irreparable loss that the NTEU will suffer if its constitutional claim is ultimately vindicated but the proceeding has taken so long that the purpose for its free speech exercise has been practically eradicated. Maintaining the case in abeyance on the district court's docket for three months should protect the interests of judicial economy embodied in the exhaustion doctrine at the same time it avoids irreparable injury to the NTEU's alleged First Amendment rights.

*It is so ordered.*