**NATIONAL TREASURY EMPLOYEES UNION, et al., Plaintiffs,**

v.

**Gwendolyn S. KING, et al., Defendants,**

**American Federation of Government Employees, AFL–CIO, Defendant–Intervenors.**

**Civ. A. No. 91–2404 (JHG).**

United States District Court, District of Columbia.

July 24, 1992.

Gregory O'Duden, Elaine Kaplan, Clinton Wolcott, NTEU, Washington, D.C., for plaintiffs.

Daniel J. Standish, Asst. U.S. Atty., Washington, D.C., for defendants.

Charles A. Hobbie, Mark D. Roth, AFGE, AFL–CIO, Washington, D.C., for defendant-intervenor (AFGE–AFL, CIO).

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

"The danger of allowing the government to suppress speech is shown in the case now before [the Court]. A grant of plenary power allows the government to tilt the dialogue heard by the public, to exclude many, more marginal voices." *International Society for Krishna Consciousness, Inc. v. Lee,* — U.S. ——, ——, 112 S.Ct. 2701, 2720, 120 L.Ed.2d 541, 559 (1992) (Kennedy, J., concurring in the judgment).

On September 24, 1991, plaintiffs National Treasury Employees Union ("NTEU"), Lendia Johnson ("Johnson"), an organizer for NTEU, and Mark Nenninger ("Nenninger"), an employee of the Social Security Administration ("SSA"), initiated this action against Gwendolyn S. King, Administrator of SSA, Louis Sullivan, Secretary of the Department of Health and Human Services ("HHS"), and Richard Austin, Commissioner of the General Services Administration ("GSA"), (collectively, "federal defendants"), seeking to secure the right to distribute leaflets to employees of SSA on sidewalks outside the entrances to the agency's headquarters in Woodlawn, Maryland.

On October 7, 1991, plaintiffs filed a motion for a preliminary injunction ("PI"), and on October 11, 1991, plaintiffs filed a motion for a temporary restraining order ("TRO") to require defendants to allow

plaintiffs to leaflet at SSA's headquarters while their motion for a PI was pending. On October 16, 1991, in opposition to plaintiffs' motions, defendants filed a motion to dismiss or, in the alternative, for summary judgment. The Court held a hearing on the parties' motions on October 21, 1991.

That same date, the Court issued a decision, holding that plaintiffs must exhaust their administrative remedies and proceed, as an initial matter, before the Federal Labor Relations Authority ("FLRA"). On March 31, 1992, the Court of Appeals for the District of Columbia Circuit upheld this Court's exhaustion analysis and further ordered "that the action be maintained on [the District Court's] docket, for a period of three months from the date this opinion issues, i.e., until June 30, 1992, or until the FLRA reaches a final decision in the NTEU's unfair labor practice proceeding at an earlier date." *National Treasury Employees Union v. King*, 961 F.2d 240, 245 (D.C.Cir.1992) ("*NTEU v. King*"). The Court of Appeals also noted that "[i]f by the June date the FLRA has not acted on the unfair labor practice, the union may renew its motions for injunctive relief in the district court." *Id.* Finally, the District of Columbia Circuit instructed this Court that "if the FLRA acts to deny the union access to the Woodlawn complex, the district court should entertain its constitutional claim." *Id.*

On June 9, 1992, having received the mandate from the Court of Appeals, this Court re-opened the action and established a briefing schedule for plaintiffs' renewed motion for injunctive relief. On June 24, 1992, plaintiffs filed a motion for expedited scheduling. Attached to that motion was the decision of the FLRA in *Social Security Administration and NTEU and AFGE*, 45 FLRA No. 27 (June 22, 1992), dismissing plaintiffs' complaint.

On June 25, 1992, the Court granted plaintiffs' request for expedited scheduling and established a hearing date of July 16, 1992 and a briefing schedule. Also on June 25, 1992, the Court issued a second Order granting the motion of the American Federation of Government Employees, AFL–CIO ("AFGE"), the recognized exclusive representative for the consolidated bargaining unit of employees of the SSA, to intervene as a defendant-intervenor. The Court further stated that it did not appear there was any reason why the Court could not issue a final decision on the merits shortly after the July 16, 1992 hearing. Neither side objected to the Court promptly issuing a final ruling on the merits.

Presently pending are plaintiffs' motion for a preliminary injunction, plaintiffs' motion for summary judgment, and federal defendants' motion for summary judgment. For the following reasons, plaintiffs' renewed motion for a PI is denied as moot, plaintiffs' motion for summary judgment is granted, and defendants' motion for summary judgment is denied.

## I. BACKGROUND

NTEU is engaged in a campaign to supplant the AFGE as the exclusive bargaining representative of approximately 49,000 SSA employees. The campaign has been underway for several years. As part of that effort, NTEU seeks to contact SSA employees who work at more than 1,300 facilities throughout the United States.

SSA's headquarters is located primarily in eleven large office buildings in Woodlawn, Maryland, a suburb approximately seven miles west of downtown Baltimore. The Woodlawn facility houses SSA's top administrative work force, its National Computer Center, its security operation, and a variety of other administrative and operational functions. Approximately 8,000 bargaining unit SSA employees are assigned to the headquarters facility in Woodlawn, Maryland.

The Woodlawn facility is boarded on the north side by Security Boulevard, a busy, six-lane suburban thoroughfare, and straddles Woodlawn Drive, another busy, suburban street. All of the buildings in the headquarters facility are set back from these streets by large lawns and parking lots.

There are no fences that surround the property in its entirety, and the entrances are unguarded. Signs are posted at the

entrances indicating that the facility is federal property and referring those who wish to use the facility to distribute literature or engage in other authorized activities to obtain a permit. Foot traffic, however, is not limited at all.

To gain access to the headquarters facility, an employee or member of the public turns from Security Boulevard, Woodlawn Drive, or Parallel Road onto smaller roads that lead to the parking lots and buildings. The facility is served by Maryland Transit Authority buses, which deposit passengers at various stops, including one in the facility at a large traffic circle. The traffic circle is surrounded on three sides by a core group of four large office buildings and is at the center of the facility. Employees can enter the interior of the buildings through doors on either side by walking along the sidewalks surrounding the buildings. The three large office buildings and several smaller buildings, which are not part of this core group, have separate parking facilities and entrances. These buildings are surrounded by pedestrian sidewalks. Assuming that business with SSA is involved, including activities conducted pursuant to a permit, members of the public have access to the sidewalks surrounding the office buildings at Woodlawn. To gain entrance to the interior of the buildings, or work areas, it is necessary to pass through security and to have official business within.

The Woodlawn facility is owned by the United States government. Management of the Woodlawn complex is governed by a delegation agreement, effective August 3, 1986, between the GSA, which owns the property, and HHS, of which SSA is a part. Under the delegation agreement, SSA, rather than GSA, is responsible for issuing permits for the distribution of literature in public areas at the Woodlawn facility.[1] The sidewalks, bus stops, and other outdoor areas within the Woodlawn facility are public areas under the GSA-promulgated Federal Property Management Regulations. *See* 41 C.F.R. § 101–20.003(z).

Between November, 1989 and April, 1991, SSA has approved permits to make distributions to employees requested by such organizations as the Little Sisters of the Poor, Mothers Against Drunk Driving, the Disabled American Veterans, and the American Legion. Similarly, during the early 1980s, NTEU conducted an organizing campaign at the Health Care Financing Administration ("HCFA"), which shares the Woodlawn facility and some of its buildings with SSA. *See American Federation of Government Employees, AFL–CIO v. Federal Labor Relations Authority*, 840 F.2d 947, 949 (D.C.Cir.1988) ("*AFGE II*").

On May 7, 1991, plaintiff Johnson filed an application for a permit to distribute literature outside the entrances to the headquarters facility each Wednesday morning from May 22, 1991 to June 22, 1991. The application was denied because "the American Federation of Government Employees (AFGE) is the exclusive representative of SSA employees at the Woodlawn Complex." Plaintiff's Motion for a Preliminary Injunction, filed October 7, 1991, ("Pl. Motion for PI"), Attachment 5. Similarly, on August 6, 1991, NTEU again applied for a permit to distribute leaflets on the Woodlawn facility grounds at building entrances and at one bus stop between August 19, 1991 and September 30, 1991. By letter dated September 24, 1991, SSA denied the permit, concluding that NTEU had not made an adequate showing that it was unable to contact SSA employees by other means. And on October 2, 1991, NTEU requested SSA to issue a permit for it to distribute leaflets at Woodlawn. The permit request, for a period through the end of December, 1991, was again denied on October 9, 1991. When asked at the hearing, government counsel did not know whether SSA had ever before denied a permit to any other individual or entity.

From mid-June, 1991, until September 16, 1991, NTEU employees, without a permit,

---

1. Plaintiffs' counsel explained at the hearing that GSA, at one time, was responsible for per- mit requests.

distributed literature at the entrances to the buildings at the Woodlawn facility approximately twice a week from 6:00 a.m. to 8:00 a.m., as employees arrived at work. Since that date, SSA has prevented NTEU employees from distributing literature at the Woodlawn facility and has denied NTEU a permit. However, SSA employees, outside their working hours and, in essence, on behalf of NTEU, have always been, and even now are, permitted to leaflet in public areas.

Defendants state that on March 6, 1991, an AFGE union member allegedly grabbed pamphlets from an NTEU organizer and hit the NTEU official in the stomach. The AFGE member also claims that he was hit. The incident occurred near the elevators in the Mid–America Program Service Center. Similarly, on April 25, 1991, an AFGE member allegedly threw coffee at an NTEU organizer. This incident occurred outside the entrance of the Northeastern Program Service Center. Again, on May 2, 1991, an AFGE official attempted to grab leaflets that an NTEU organizer was attempting to distribute. The AFGE official claims that he was pushed and caused to fall, resulting in an injury to his hand. This incident occurred directly beside the Western Program Service Center. Finally, in another incident at the Woodlawn complex, SSA's employees were allegedly blocked from gaining access to one building when the competing unions attempted to distribute literature at the building's entrance.

## II. DISCUSSION

Summary judgment is appropriate when there is "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). "The inquiry performed is the threshold inquiry of determining whether there is a need for trial—whether, in other words, there are any genuine issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. at 2513. At the same time, however, Rule 56 places a burden on the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

■ It is undisputed that distribution of literature is a form of "speech" that is protected by the First Amendment. As the Second Circuit recently explained, "[F]rom the time of the founding of our nation, the distribution of written material has been an essential weapon in the defense of liberty." *Paulsen v. County of Nassau*, 925 F.2d 65, 66 (2d Cir.1991). In fact, it has been specifically recognized that the First Amendment protects the rights of union representatives to communicate with employees concerning matters related to collective bargaining and to their right to organize. *See, e.g., Thomas v. Collins*, 323 U.S. 516, 533–34, 65 S.Ct. 315, 324–25, 89 L.Ed. 430 (1945). Conversely, the First Amendment protects the rights of citizens to receive information and to acquire useful knowledge. *Red Lion Broadcasting v. FCC*, 395 U.S. 367, 390, 89 S.Ct. 1794, 1806, 23 L.Ed.2d 371 (1969). Thus, it is plaintiffs' contention that the denial of permit requests infringes on both NTEU's rights and the rights of the SSA employees based at Woodlawn.

■ The standards for reviewing the constitutionality of the denial of NTEU's permit requests are well established. The caselaw reflects a "forum-based" approach for analyzing restrictions that the government seeks to place on the use of its property. Regulation of speech on government property that has traditionally been available for public expression is subject to heightened scrutiny; specifically, such restrictions survive only if they are narrowly drawn to achieve a compelling state interest and leave open ample alternative chan-

nels for communication. Property that has been opened up for expressive activity by part or all of the public is subject to the same limitations as those governing a traditional public forum. Restrictions affecting all. remaining public property, however, need only be reasonable and cannot constitute an effort to suppress the speaker's activity because of a disagreement with the speaker's view. *See Krishna Consciousness,* —— U.S. at ——, 112 S.Ct. at 2704.

■■■ Plaintiffs first argue that the sidewalks at Woodlawn constitute "traditional" public forums. Under recent Supreme Court jurisprudence, plaintiffs' argument is unpersuasive.

It has long been recognized that sidewalks, as with streets and parks, are among those areas of public property that traditionally have been held open to the public for expressive activities and are considered quintessential public forums. *See United States v. Grace,* 461 U.S. 171, 179–80, 103 S.Ct. 1702, 1708–09, 75 L.Ed.2d 736 (1983). In the familiar words of Justice Roberts,

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonancé with peace and good order; but it must not, in the

guise of regulation, be abridged or denied.

*Hague v. Committee for Industrial Organization,* 307 U.S. 496, 515–16, 59 S.Ct. 954, 963–64, 83 L.Ed. 1423 (1939).

Nonetheless, not every sidewalk can be analyzed under the rubric of "traditional public forum." The mere fact that a walkway may be open to the public does not alone establish that such an area must be treated as a traditional public forum for purposes of the First Amendment. Rather, "the location and purpose" of a publicly owned sidewalk is critical to determining whether such an area constitutes a traditional public forum. *United States v. Kokinda,* 497 U.S. 720, ——, 110 S.Ct. 3115, 3121, 111 L.Ed.2d 571 (1990). Under the language of *Kokinda,* the Court cannot hold that "[t]he ... sidewalk[s] at issue [have] the characteristics of public sidewalks traditionally open to expressive activity." *Id.* 497 U.S. at ——, 110 S.Ct. at 3120.

■■■ Plaintiffs next argue that the government has created a public forum by designation. In deciding whether the government intended to "designate" certain property as a public forum, the Court must consider whether the government intentionally opened up the sidewalks for public discourse, whether the sidewalks are separate and apart from acknowledged public areas, whether the sidewalks have as a principal purpose the free exchange of ideas or have been dedicated to expression in the form sought to be exercised here,[2] and "the nature of the property and its compatibility with expressive activity." *Krishna Consciousness,* —— U.S. at ——— ——, 112 S.Ct. at 2704–07. *Community for Creative Non–Violence v. Turner,* 893 F.2d 1387, 1390–91 (D.C.Cir.1990). Although federal defendants argued at the hearing that there is no evidence SSA has swung open its doors, there are several

**2.** The Court certainly recognizes from the caselaw that the "purpose" of the area at issue is a factor it is constrained to consider in determining whether certain property constitutes a public forum. Nonetheless, the Court finds persuasive Justice Kennedy's suggestion that "[t]he notion that traditional public forums are property which have public discourse as their principal purpose is a most doubtful fiction.... It would seem apparent that the principal purpose of streets and sidewalks, like airports, is to facilitate transportation, not public discourse...." *Krishna Consciousness,* —— U.S. at ——, 112 S.Ct. at 2717 (Kennedy, J.).

factors that lead the Court to conclude that defendants have exhibited an intent to hold the sidewalks open to the public for a range of free speech activities and thus, have created public forums by designation.

 First, the District of Columbia Circuit has suggested that the existence of regulations governing speech and speech-related conduct may evince an intent to create a public forum. *Community for Creative Non–Violence*, 893 F.2d at 1391. Here, GSA has promulgated regulations that allow any individual or organization to engage in leafletting in "public areas"[3] by requesting a permit. *See* 41 C.F.R. § 101–20.401.[4] Nowhere do the GSA rules purport to limit permits to certain groups or individuals. In fact, although the regulations prohibit "commercial activity" in public areas, they explicitly caution that "commercial activity" does not include those "activities where commercial aspects are incidental to the primary purpose of expression of ideas or advocacy of causes." 41 C.F.R. §§ 101–20.003(d), 101–20.-403(a)(2). Thus, if an application is properly submitted, permits to distribute non-commercial, non-obscene literature may be denied only when the activity would interfere with access to the public area, disrupt official business, interfere with approved uses of the building by its tenants or the public, or damage property. 41 C.F.R. § 101.20–403. By promulgating regulations that govern speech and by recognizing that the sidewalks at Woodlawn constitute public areas for purposes of those regulations, defendants have clearly exhibited an intent to create a public forum under the First Amendment.

In addition, leafletting on the sidewalks is entirely consistent with the government's purpose in operating the Woodlawn facility and with the past practices at Woodlawn and similar federal facilities. For example, in the last several years, the agency has granted permits to distribute literature on the sidewalks to at least seven organizations, including the American Legion, the Disabled American Veterans, the Little Sisters of the Poor, and the Maryland Chapter of the Mothers Against Drunk Driving. In fact, there is a history of literature distribution in the public areas of the Woodlawn facility, including the distribution of union organizing leaflets by NTEU. *American Federation of Government Employees, AFL–CIO v. Federal Labor Relations Authority*, 793 F.2d 333, 335 (D.C.Cir.1986) (*"AFGE I"*), aff'd after remand, 840 F.2d 947 (D.C.Cir.1986). As the District of Columbia Circuit described NTEU's prior activities:

NTEU began its efforts at the complex in late November 1981 outside the entrances of the buildings occupied by HCFA. Soon representatives of NTEU took their mission indoors, distributing literature and soliciting signatures in the first floor lobby and the ground floor hallways of the East Low Rise. Sometime during December, [William] Holman[, HCFA's Director of Labor Relations,] accosted an NTEU representative in a public area of the building and asked whether GSA had granted the union permission to solicit there. The representative responded that permission had been granted; testimony in the record indicates that GSA indeed gave permission, though not (so far as appears) in the form of a written permit. NTEU's campaign in the public areas continued until the Christmas holiday.

*AFGE II*, 840 F.2d at 949.

Finally, the nature of the Woodlawn facility further supports this Court's conclusion that the sidewalks constitute public

---

**3.** Public areas are defined as those places "normally open to members of the public" and "not assigned to a lessee or occupant agency." 41 C.F.R. § 101–20.003(z).

**4.** Interestingly, GSA promulgated the regulations pursuant to the Public Buildings Cooperative Uses Act of 1976, which was designed to "encourage the public use of public buildings for cultural, educational and recreational activi-

ties," and authorizes GSA to make available "auditoriums, meeting rooms, courtyards, rooftops, and lobbies of public buildings to persons, firms, or organizations engaged in cultural, educational or recreational activities ... that will not disrupt the operation of the building." Pub.L. 94–541, 90 Stat. 2505, Sec. 102(a)(4), 104(a)(17).

forums. The Woodlawn facility is boarded on the north side by Security Boulevard, a busy, suburban thoroughfare, and straddles Woodlawn Drive, another busy, suburban street. There are no fences that surround the property, and the entrances are unguarded. In addition, the facility is served by Maryland Transit Authority buses, which stop in the Woodlawn complex.

Neither *Krishna Consciousness* nor *Kokinda* nor *Greer v. Spock*, [5] all cases on which defendants rely, casts doubt on this Court's holding, and, in fact, they support the conclusion that the sidewalks at Woodlawn constitute public forums.

Although the Supreme Court in *Krishna* held that publicly owned airports are not public forums, Chief Justice Rehnquist alluded to the fact that the sidewalks outside the terminals likely maintain a different status:

> The Port Authority has concluded that its interest in monitoring the activities can best be accomplished by limited solicitation and distribution to the sidewalk areas outside the terminals.... The sidewalk area is frequented by an overwhelming percentage of users.... Thus the resulting access of those who would solicit the general public is quite complete. In turn, we think it would be odd to conclude that the Port Authority's terminal regulation is unreasonable despite the Port Authority having otherwise assumed access to an area universally traveled.

*Krishna Consciousness,* —— U.S. at —— ——, 112 S.Ct. at 2708–09. By the same token, the Court in *Kokinda* appeared to focus primarily on the question whether the sidewalk between the parking lot and the Post Office should be considered a "traditional" public forum and did not analyze in detail the issue of designation. In addition, the Court there was particularly concerned that the sidewalk at issue in that case "lead[ ] only from the parking area to the front door of the post office," and, therefore, it could not realistically be con-

sidered a place where people could enjoy the "open air." *Kokinda,* 110 S.Ct. at 3120. And *Greer* concerned a federal military base, which, by regulation, prohibited demonstrations, picketing, sit-ins, protest marches, political speeches, and "similar activities." *Greer,* 424 U.S. at 831, 96 S.Ct. at 1214. Additionally, the Court in *Greer* emphasized repeatedly that the basic function of the base has been " 'the historically unquestioned power of [its] commanding officer summarily to exclude civilians from the work area of his command.' " *Greer,* 424 U.S. at 838, 96 S.Ct. at 1217 (citation omitted).[6] Woodlawn does not possess the same characteristics as the properties at issue in *Krishna, Kokinda,* and *Greer.*

Under these circumstances, the Court must conclude that the sidewalks outside the buildings at the Woodlawn facility constitute public forums by designation. Therefore, in order to survive constitutional scrutiny, the restriction on First Amendment activity must be content-neutral, narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels of communication. *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2752, 105 L.Ed.2d 661 (1989). The government here has failed entirely to shoulder its burden of demonstrating a compelling justification for its refusal to grant NTEU a permit or that there are ample alternative channels of communication.

■ Defendants appear to advance two principal interests in support of its argument that there has been no First Amendment violation: First, passing out leaflets is disruptive, and second, granting permits to NTEU would violate the federal labor law's prohibition of providing unlawful assistance to a labor organization. Defendants' arguments are unpersuasive.

■ The government points to four isolated instances, primarily involving conflict between the employees of the rivalling unions, to justify, in part, its decision to deny

---

**5.** 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976).

**6.** The experience also demonstrates that leafletting outside the buildings, in non-work areas, is compatible with the functioning of the facility.

NTEU permit requests.[7] However, "a hostile audience is not a basis for restraining otherwise legal First Amendment activity." *Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v. District of Columbia,* 919 F.2d 148, 150 (D.C.Cir.1990) (citation omitted). As the Supreme Court has suggested, "The First Amendment is often inconvenient. But that is besides the point. Inconvenience does not absolve the government of its obligation to tolerate speech." *Krishna Consciousness,* ―― U.S. at ――, 112 S.Ct. at 2719 (Kennedy, J.). In fact, passing out leaflets may be one of the least disruptive forms of expression NTEU could employ to communicate with SSA employees, for it does not require employees to stop in order to receive the messages NTEU wishes to convey. As Justice O'Connor expressed it, "[W]e have expressly noted that leafletting does not entail the same kinds of problems presented by face-to-face solicitation. Specifically, '[o]ne need not ponder the contents of a leaflet or pamphlet in order mechanically to take it out of someone's hand.' " *Krishna Consciousness,* ―― U.S. at ――, 112 S.Ct. at 2713 (O'Connor, J., concurring) (citation omitted). Rather, the recipient is free to read the message at a later time. Indeed, SSA could avoid any such incidents by imposing reasonable time, place, and manner restrictions on those who distribute the literature.[8]

▮ Second, neither the government nor AFGE can legitimately argue that NTEU may be prevented from leafletting on the basis of NTEU's status as a rival union. As the Supreme Court observed in *Perry Education Association v. Perry Local Educators' Association,* 460 U.S. 37, 52, 67, 103 S.Ct. 948, 959, 966, 74 L.Ed.2d 794 (1983), under a "reasonableness" test, the interest in "insuring labor peace" and preventing "inter-union squabbles" may suffice to exclude a rival union from a non-public forum, but a public employer may not exclude a union from property that constitutes a public forum merely because another union is the incumbent. Similarly, in *City of Madison, Joint School District No. 8 v. Wisconsin Employment Relations Commission,* 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976), the Supreme Court held that even assuming state labor laws were applicable, a teacher could not be precluded from directly addressing his or her employer, in that case the School Board, at a town meeting that was a public forum. Thus, as applied to the facts of this case, *Perry* and *City of Madison* render irrelevant the government's reliance on federal labor law as a justification for denying NTEU access to Woodlawn.[9]

Lastly, the Court cannot hold that plaintiffs have ample alternative channels of communication. As the Court of Appeals suggested, "The geographic layout of the Woodlawn facility makes it impractical to distribute leaflets on the public sidewalks surrounding the facility. SSA employees park on lots within the complex and walk from there to their office buildings. Attempting to distribute the leaflets from the public sidewalks to moving cars is neither feasible nor safe." *NTEU v. King,* 961 F.2d at 241 n. 1. Moreover, many employees travel to work on buses, which proceed directly into the facility and stop only at the traffic circle. Even were NTEU to distribute leaflets at the entrances to the facility, they would not be able to reach those employees who travel to work on the public buses.

There is also little question that requiring NTEU to reach the individuals at Woodlawn by telephoning them at their

---

7. Interestingly, this rationalization was not highlighted at the oral hearing.

8. Plaintiffs have represented at various stages in the proceedings that the distributions would occur in discrete areas, principally in or near the traffic circle and the surrounding sidewalks. *See* Transcript of Proceedings in the United States Court of Appeals for the District of Columbia Circuit ("Tr."), at 11.

9. It is worth noting that the purposes underlying the federal labor statute, 5 U.S.C. § 7116(a)(3), are not implicated here. Section 7116(a)(3) "is aimed primarily at preventing agency domination of unions and preserving the bargaining representative's independence." *AFGE II,* 840 F.2d at 955–56. Allowing *all* unions access to a public forum in no way compromises that neutrality.

homes would be onerous. As the appellate panel suggested at oral argument, "When you think about the task of trying to locate the people by telephone books in the Washington metro area, it is a lot of phone books and a lot of times people with similar names. If you have got somebody on the job name[d] John Smith, you have got an awful lot of John Smiths and J.R. Smiths and J.D. Smiths and may never get the right one." Tr., at 20. In fact, the dynamics of telephone contact are markedly different from those of face-to-face contact. As one Circuit Judge suggested at argument, "When you get called on a Saturday afternoon at home by somebody wanting to solicit you for a labor union, your irritability quotient is up to here." Tr., at 20.

## III. CONCLUSION

Having determined that it is a violation of the First Amendment of the Constitution when defendants deny plaintiffs reasonable requests for permits to distribute literature on the sidewalks at the headquarters facility of the Social Security Administration in Woodlawn, Maryland and for the reasons expressed above, it is hereby

ORDERED that plaintiffs' motion for summary judgment is granted; it is

FURTHER ORDERED that defendants' motion for summary judgment is denied; it is

FURTHER ORDERED that plaintiffs' motion for a preliminary injunction is denied as moot.

For the reasons expressed herein, there shall be no stay of this Memorandum Opinion and Order should defendants and/or defendant-intervenor elect to appeal.

IT IS SO ORDERED.