**NATIONAL TREASURY EMPLOYEES UNION, Petitioner,**

v.

**FEDERAL LABOR RELATIONS AUTHORITY, Respondent,**

**American Federation of Government Employees, AFL–CIO, Intervenor.**

**NATIONAL TREASURY EMPLOYEES UNION, et al., Appellees,**

v.

**John CALLAHAN, Acting Administrator, Social Security Administration, et al., Appellants,**

**American Federation of Government Employees, Local 888, Appellant.**

**Nos. 97–1204, 92–5272 and 92–5307.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 18, 1997.

Decided March 27, 1998.

Rehearing Denied June 11, 1998.

12. Nor do we address the argument that Fiechter's actions should be validated under the de facto officer doctrine.

In case No. 97–1204, Elaine D. Kaplan, Washington, DC, argued the cause for petitioner National Treasury Employees Union, with whom Gregory O'Duden, Washington, DC, was on the briefs.

David M. Smith, Solicitor, Federal Labor Relations Authority, Washington, DC, argued the cause for respondent FLRA, with whom James F. Blandford and Shari Polur, Attorneys, Washington, DC, were on the brief. William R. Tobey, Deputy Solicitor, Washington, DC, entered an appearance.

Mark D. Roth and Judith Galat, Washington, DC, were on the brief for intervenor American Federation of Government Employees, AFL–CIO.

In case Nos. 92–5272 and 92–5307, Judith Galat, Washington, DC, argued the cause for appellant American Federation of Government Employees, Local 888, with whom Mark D. Roth, Washington, DC, was on the briefs.

R. Craig Lawrence, Assistant U.S. Attorney, Washington, DC, argued the cause for the Federal appellants, with whom Mary Lou Leary, U.S. Attorney, Washington, DC, at the time the briefs were filed, was on the briefs. John D. Bates, Assistant U.S. Attorney, Washington, DC, entered an appearance.

Elaine D. Kaplan, Washington, DC, argued the cause for appellees National Treasury Employees Union, et al., with whom Gregory O'Duden, Washington, DC, was on the brief. Clinton D. Wolcott, Washington, DC, entered an appearance.

Before: WALD, SILBERMAN, and GINSBURG, Circuit Judges.

GINSBURG, Circuit Judge:

The Social Security Administration several times denied the National Treasury Employees Union a permit to distribute leaflets in front of the SSA buildings on the government campus in Woodlawn, Maryland. The NTEU filed unfair labor practice charges with the Federal Labor Relations Authority, and sued the Administrator of the SSA in district court alleging a violation of the First Amendment to the Constitution of the United States.

In No. 97–1204 the NTEU petitions for review of the decision of the Federal Labor Relations Authority that the permit denials neither discriminated against the NTEU nor unlawfully assisted the incumbent union, the American Federation of Government Employees. We uphold the FLRA's decision that the SSA did not unlawfully assist the AFGE. The FLRA's decision that the SSA did not discriminate against the NTEU, however, was premised upon an erroneous reading of the case law, and we therefore remand that aspect of the case to the FLRA for reconsideration.

In Nos. 92–5272 and 92–5307 the SSA and the AFGE appeal the decision of the district court holding that the SSA's denials of a permit to the NTEU to distribute literature at Woodlawn abridged the NTEU's freedom of speech, in violation of the first amendment. We remand this claim for the district court to determine whether there is still a case or controversy between the parties in light of our decision in No. 97–1204.

## I. Background

The controversy among the NTEU, the SSA, and the AFGE began in 1991 when the NTEU, which was organizing a nationwide campaign to replace the AFGE as the exclusive bargaining representative of SSA employees, applied several times for a permit to distribute leaflets outside the SSA buildings on the Woodlawn campus. The SSA denied each request on the ground that the Federal Service Labor–Management Relations Act, 5 U.S.C. § 7116(a)(3), so required. *See, e.g.,* Letter to Clinton Wolcott, Assistant Counsel, NTEU, from Marilyn G. O'Connell, Acting Associate Commissioner for Facilities Management, SSA (Sept. 24, 1991) (stating that "the agency in 'control' of the premises must deny access to the nonincumbent union absent an inability to reach the agency's employees through reasonable, alternative means of communication"). Section § 7116(a)(3) makes it an unfair labor practice for an agency to

sponsor, control, or otherwise assist any labor organization, other than to furnish, upon request, customary and routine services and facilities if the services and facilities are also furnished on an impartial basis to other labor organizations having equivalent status.

The Act also makes it an unfair labor practice to "interfere with, restrain, or coerce any employee in the exercise by the employee of any right under this [statute]." *Id.* § 7116(a)(1).

The NTEU sued the Administrator of the SSA and other officials in district court, claiming that the SSA's denials of its applications for a permit violated the Union's right to free speech under the first amendment. The district court held that the SSA had indeed violated the first amendment by denying to the NTEU the right to speak in a "public forum," *see NTEU v. King,* 798 F.Supp. 780 (D.D.C.1992), and the SSA appealed to this court.

The NTEU also filed a charge with the FLRA claiming that the SSA's denial of its applications for a permit was an unfair labor practice. The FLRA held that the SSA had acted correctly under the circumstances for two reasons. First, the SSA's refusal to issue a permit did not violate § 7116(a)(1) of the FSLMRA because that subsection protects only the rights of employees; it does not give a nonincumbent union any right of access to the property of the employing agency, at least where the complainant is not an affected employee. Second, to have issued a permit, according to the FLRA, would have "assisted" the NTEU, in violation of § 7116(a)(3) of the Act. *See Social Security Administration and National Treasury Employees Union and American Federation of Government Employees,* 45 FLRA 303 (1992).

Upon the NTEU's petition for review of the decision of the FLRA, we held that the Authority had erred in failing to consider the first amendment implications of its decision and we remanded the matter to the Authority for reconsideration. *See NTEU v. FLRA,* 986 F.2d 537 (D.C.Cir.1993). We then held the SSA's appeal of the district court's decision in abeyance pending the outcome of the proceedings upon remand before the FLRA.

Upon remand the FLRA took as its starting point the analytical framework set out by the Supreme Court in *NLRB v. Babcock & Wilcox Co.,* 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956), for dealing with the union access issue as it arose under the National Labor Relations Act. *See Social Security Administration and National Treasury Employees Union and American Federation of Government Employees,* 52 FLRA 1159, at 29–30 (1997). The FLRA recognized that the initial organizing campaigns generally analyzed in *Babcock & Wilcox* and "its progeny" did not match the facts of the current case; purportedly applying the principles of *Babcock & Wilcox,* however, the FLRA held that the SSA's denials of the NTEU's permit requests did not violate § 7116(a)(1) of the FSLMRA because the NTEU failed to show that such denials discriminated against the NTEU. The Authority also held that the SSA had not, by denying the permit requests of the NTEU, assisted the AFGE in violation of § 7116(a)(3). The NTEU now petitions the court to review both aspects of that decision.

## II.   No. 97–1204

The NTEU does not challenge the Authority's adoption of the *Babcock & Wilcox* framework. The Union does argue, however, that under that framework the SSA should be held to have discriminated against the NTEU and to have unlawfully assisted the incumbent AFGE.

## A.   § 7116(a)(1)

After stating that it was adopting the framework of *Babcock & Wilcox* and its progeny "as a starting point" for analysis, *see* 52 FLRA 1159, at 27, the FLRA described that framework as follows: In *Babcock & Wilcox* the Supreme Court held that an employer subject to the NLRA may maintain a general policy of denying non-employee solicitors access to its premises; it may not discriminate against union solicitors, however, by granting access to solicitors for other types of organizations. *See* 351 U.S. at 112, 76 S.Ct. at 684. The excluded "union has the burden of showing that . . . the employer's access rules discriminate against the union's solicitation." *NLRB v. Southern Maryland Hospital Center,* 916 F.2d 932, 936 (4th Cir. 1990) (quoting *Sears Roebuck & Co. v. San Diego County District Council of Carpenters,* 436 U.S. 180, 205, 98 S.Ct. 1745, 1761–62, 56 L.Ed.2d 209 (1978)).

The National Labor Relations Board has created, and this court has approved, an exception to the general rule of *Babcock & Wilcox* for "isolated beneficent acts": An employer that has a no-solicitation rule but nonetheless grants access to a few charitable organizations does not thereby lose its right to exclude unions under its general rule against solicitation. *See Lucile Salter Packard Children's Hosp. v. NLRB*, 97 F.3d 583, 587 (D.C.Cir.1996); *Hammary Mfg. Corp.*, 265 NLRB 57, 57 n. 4 (1982). In deciding whether grants of access to charitable organizations fall within the "isolated beneficent acts" exception, the Board does not employ a per se approach but rather looks at the "quantum of ... incidents." *Hammary*, 265 NLRB at 57 n. 4.

Stating that "[t]he NLRB's interpretation and application of *Babcock*'s nondiscrimination rule has been reviewed by several United States Courts of Appeals," the FLRA then cited without analysis certain conflicting decisions applying *Babcock & Wilcox.* 52 FLRA 1159, at 28. From this descriptive exercise (or at least after it) the FLRA concluded that "[t]he principles articulated in the [cited] decisions suggest that '[b]y inviting the public to use an area of its property, the employer does not surrender its right to control the uses to which that area is put.'" *Id.* (quoting *Baptist Medical System v. NLRB*, 876 F.2d 661, 664 (8th Cir.1989)).

Turning to the facts of this case, the Authority said there could be "no doubt that SSA has differentiated among the organizations that it has allowed to solicit"; specifically, while denying the NTEU's requests for permits, the SSA had granted permits to several "beneficent organizations" to solicit money or membership—including the Disabled American Veterans, the American Legion, the Little Sisters of the Poor, and Mothers Against Drunk Driving. 52 FLRA 1159, at 30. The FLRA found, however:

> [T]he record is silent as to whether any other [i.e., nonbeneficent] organizations have sought, been granted, or been denied access to SSA's premises.
>
> ... Moreover, the parties' arguments do not address whether the number of permits granted during the time period have

been isolated and limited to a small number of beneficent organizations.... As a result, we do not find that SSA's denial of access to NTEU, which occurred during the same time period that it granted occasional access to charitable organizations, violated the *Babcock* non-discrimination rule.

*Id.*

■ The NTEU argues that upon the present facts the FLRA erred in finding no violation of the general rule of *Babcock & Wilcox.* We agree. Under that rule, the SSA's denial of the NTEU's permit request while granting permits to other organizations would be unlawful discrimination unless the exception for isolated beneficent acts (or some other exception) applies. The predicate for the rule is lacking here, however: the SSA does not have a general no-solicitation policy. To the contrary, the agency administers its permit process pursuant to the Federal Property Management Regulations, by authority delegated from its landlord, the General Services Administration. The FPMR states that every application for a permit must be granted unless it is faulty in form or the proposed use falls into one of five specifically excluded categories. *See* 41 C.F.R. § 101–20.402(a) ("A permit shall be issued ... within 10 working days following [the administering agency's] receipt of the completed applications"); *id.* § 101–20.403(a) (the agency "shall disapprove any application ... if" the proposed use is commercial, obscene, intended to influence judicial proceedings, interferes with government uses of the property, or violates the prohibition against political solicitation in 18 U.S.C. § 607).

■ Because the SSA does not have a general no-solicitation policy, *Babcock & Wilcox* and its sequelae do not protect the SSA's denial of permits to the NTEU. Moreover, even if the SSA did have a general no-solicitation policy, we would have to fault the Authority for applying the isolated beneficent acts exception without examining the "quantum ... of incidents" in which the SSA granted permits to beneficent organizations, as it should have done before finding that the SSA's prior "beneficent acts" were indeed

"isolated." To the extent that the FLRA relies upon *Babcock & Wilcox* and "its progeny," therefore, the Authority's interpretation of the case law is erroneous and we must reverse its decision based thereon.

■ Our analysis does not end here because the FLRA was not required to adopt the rule of *Babcock & Wilcox* in the first place; nor, having done so, was it required to adopt the NLRB's exception for isolated beneficent acts. It is possible that the Authority intended, by its summary statement of the case law secondary to *Babcock & Wilcox,* to articulate its own standard under the FSLMRA, one more deferential to the federal agency employer than is the standard of *Babcock & Wilcox* to private employers. (Recall that the Authority had concluded that the cases "suggest that by inviting the public to use an area of its property, the employer does not surrender the right to control the use to which that area is put.") Such a standard might, for example, permit an agency employer to exclude union solicitors from its premises while allowing all (or almost all) manner of other groups to engage in solicitation pursuant to the FPMR. To the extent that the FLRA may have intended to create any such new standard, however, that standard raises a serious constitutional question, as we have previously pointed out in this very litigation, *see NTEU v. FLRA,* 986 F.2d 537, 539–40 (D.C.Cir.1993); it also lacks any grounding in the cases cited, and the Authority neither described it clearly enough nor explained its reasoning sufficiently to permit us to affirm its decision upon that basis. *See SEC v. Chenery Corp.,* 318 U.S. 80, 88, 63 S.Ct. 454, 459–60, 87 L.Ed. 626 (1943) (holding that reviewing court may not affirm agency decision on basis of rationale agency itself did not adopt).

■ The FLRA also held, as an alternative basis for its conclusion, that even if the SSA did discriminate against the NTEU the Authority would not apply the standard of *Babcock & Wilcox* retroactively to the actions of the SSA. Rather, the Authority would judge the SSA under the standard in place when the SSA denied the NTEU's applications for a permit to distribute leaflets. *See* 52 FLRA 1159, at 31 n.25. The NTEU objects that the FLRA's concern with retroactivity is misplaced because the Union seeks only forward-looking relief, and in any case retroactive application of the new rule would be permissible under the case law of this circuit.

We agree with the NTEU that the Authority's concern with retroactivity is unwarranted. If the Authority does conclude upon remand that the SSA engaged in an unfair labor practice, then the SSA will not be unfairly imposed upon by the relief to which the NTEU would be entitled. A declaration to the effect that an employer committed an unfair labor practice, when based upon a newly-adopted standard, is indeed retroactive but only in the way familiar to private sector labor law and indeed inherent in both administrative and common law adjudication. *See, e.g., Consolidated Freightways v. NLRB,* 892 F.2d 1052, 1058 (D.C.Cir.1989) ("new rules announced in agency adjudications may be applied retroactively absent any 'manifest injustice'"); *Daily News of Los Angeles v. NLRB,* 73 F.3d 406 (D.C.Cir.1996) (upholding NLRB decision finding newspaper liable for unfair labor practice by overruling prior Board decision); 13A WRIGHT, MILLER & COOPER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION 2D § 3535 n.20 ("[o]rdinarily the litigants in the case producing a new rule of law are controlled by the new rule"). Indeed, the SSA does not even face potential liability for backpay or other material relief to which employers in both the public and the private sector are routinely exposed upon the basis of "retroactive" adjudication. To the extent that the FLRA, upon further reconsideration, adheres to the standard of *Babcock & Wilcox,* therefore, it may not decline to find a violation merely because it had not yet adopted that standard when the SSA denied the NTEU's requests for permits.

In sum, we remand to the FLRA the question whether the SSA violated § 7116(a)(1); the Authority may either reaffirm its embrace of the *Babcock & Wilcox* standard and hold that the SSA discriminated against the NTEU in violation of that section, or it may adopt some other standard by which to judge the SSA's denial of per-

mits to the NTEU. If the SSA violated the Act under whatever standard the FLRA adopts, however, then the Authority may not deny the NTEU a remedy on the ground that it must avoid retroactive lawmaking.

### B. § 7116(a)(3)

■ The FLRA also held that the SSA's denial of permits to the NTEU did not violate § 7116(a)(3), which makes it an unfair labor practice for an employee to assist a labor union. According to the Authority "there are certain advantages that go with incumbency," and "denial of access to a rival, in and of itself, does not equate to sponsorship, control, or assistance to the incumbent"; nor was there any evidence that the SSA had "sponsor[ed], control[led], or assist[ed] AFGE" in any other way. 52 FLRA 1159, at 23. The NTEU objects that the AFGE did benefit—in the form of enhanced prospects for re-election—from the disadvantage the NTEU incurred in being denied access to the grounds of the SSA, and because the denials of the permits were unlawful, the advantage gained by the AFGE was a fortiori unlawful assistance.

The FLRA approached this issue, reasonably we think, by asking the functional question whether the employer "interfered with employee freedom of choice by failing to maintain the appropriate arms-length relationship with the labor organization involved." 52 FLRA 1159, at 22. Answering the question by reference to the totality of the circumstances, the Authority concluded that the advantage the SSA indirectly conferred upon the incumbent AFGE—by excluding the rival NTEU from the agency's premises—did not constitute assistance, sponsorship, or control within the meaning of those terms in § 7116(a)(3):

> [T]here is no evidence that through this denial of access SSA interfered with its employees' freedom of choice or failed to maintain the proper arms-length relationship with AFGE.... [T]here is no evidence that AFGE is ... controlled by SSA.... Nor is there evidence that the

denial was viewed by the employees as indicative of the agency favoring AFGE. 52 FLRA 1159, at 23.

■ In this context "evidence" includes not only empirical data but also the Authority's expert judgment on the question whether the employer's conduct tends to interfere with the employees' freedom of choice. *Cf. NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 792–93, 110 S.Ct. 1542, 1552–53, 108 L.Ed.2d 801 (1990) (finding it not irrational for NLRB to refuse to apply presumption that replacement workers do not support striking union, in light of Board's assumptions drawn from its expertise); *General Electric Company v. NLRB*, 117 F.3d 627, 636 (D.C.Cir.1997) (enforcing Board decision that distribution of postelection benefits while objections to election were still unresolved was impermissible attempt to interfere with employees' freedom of choice about unionization). We therefore affirm the Authority's interpretation of the record upon the ground that the Authority, in the exercise of its expert judgment, found no reason to believe that the employer failed to maintain the appropriate arms-length relationship with the AFGE. Consequently, we need not determine whether, as the FLRA seems to have believed, the AFGE was entitled to the advantage of exclusive access to the sidewalks as a benefit of incumbency.

### III. Nos. 92–5272 and 92–5307

The first amendment claim in the AFGE's appeal from the decision of the district court, which we have heretofore held in abeyance, may now be moot by virtue of the FLRA's change of position in the unfair labor practice case. The FLRA's current position constitutes a retreat—without objection on the part of the AFGE—from the position the Authority took in its first decision, namely, that the FSLMRA required the SSA to deny the permit request of a nonincumbent union. Assuming the FLRA adheres to the framework of *Babcock & Wilcox* upon remand, therefore, the SSA will not be able to deny on that ground any future permit application the NTEU may file. Indeed, the SSA may well have to grant the NTEU's next request for a permit—in which case there would

seem to be no continuing controversy and no need for the court to resolve the constitutional question.

Moreover, even if the SSA does again deny a permit to the NTEU, it will presumably do so in a manner consistent with the FLRA's new interpretation of the Act. Any such denial would therefore have to depend upon a rationale different from the SSA's reason for denying the NTEU's permit in 1991. To decide now whether a hypothetical future permit denial by the SSA would violate the first amendment would be to risk giving an advisory opinion in an area where the court should be particularly keen to avoid any unnecessary ruling. *See Clinton v. Jones,* —— U.S. ——, —— n. 11, 117 S.Ct. 1636, 1642 n. 11, 137 L.Ed.2d 945 (1997) ("It has long been the Court's considered practice not to decide abstract, hypothetical or contingent questions ... or to decide any constitutional question in advance of the necessity for its decision....").

In sum, the constitutional issue arising from the permit denials of 1991 may be moot as a practical matter. *See Belton v. Washington Metropolitan Area Transit Authority,* 20 F.3d 1197, 1203 (1994) (decision to require retrial based upon one issue makes other issue "moot as a practical matter although not in the strict sense"). The issue of mootness was not briefed by the parties, however, and the record before us is stale inasmuch as the FLRA has redefined, and may yet further redefine, the obligations of the SSA under the FSLMRA. We therefore remand this case for the district court to determine in the first instance, upon the basis of an updated record if that seems advisable, whether there is a live constitutional case or controversy between the parties.

### IV. Conclusion

In No. 97–1204 the FLRA permissibly concluded that the SSA's denial of a permit to the NTEU did not "assist" the AFGE in violation of § 7116(a)(3) of the FSLMRA. On the other hand, the Authority's conclusion that the SSA did not discriminate against the NTEU in violation of § 7116(a)(1) of the FSLMRA is based upon an erroneous reading of the *Babcock & Wilcox* line of cases.

We therefore affirm the decision of the FLRA upon the first issue and remand the second issue to the Authority for further consideration. We also remand the first amendment cases, Nos. 92–5272 and 92–5307, to the district court for a determination of whether that dispute is (or with the issuance of the opinion in No. 97–1204 is about to become) moot.

*So ordered.*